Argued May 1; reversed June 18, 1946

## PEREZ *v.* POTIER ET AL.
(170 P. (2d) 343)

Martin W. Hawkins, Judge.

*W. L. McFarling* and *Ira W. Carl*, both of Portland, for appellants.

*L. B. Sandblast*, of Portland, for respondent.

Before BELT, Chief Justice, and RossMan, BAILEY, LUSK, BRAND and HAY, Justices.

BAILEY, J. This suit was brought by Pedro Carlos Perez against Maybell Potier, as executrix of the last will and testament of Bessie Potier, deceased, and against Maybell Potier and Marie Potier and W. J. Senne, individually, beneficiaries under that will, for a decree adjudging him the owner of a tract of land in Multnomah county, and all "equipment on said premises, including all house furniture, fixtures, utensils and other articles used in and belonging to the residence building, all goods and stock on hand used for living purposes and for sale in the usual course of business operation, all dairy equipment, all garden and other tools and supplies, used in the operation of said premises, all articles of whatever nature used upon and about said premises, all live stock with which said premises were stocked, all chickens upon said premises, and all cash derived from the operation of said premises and business", with the exception of "jewelry, clothing and strictly personal articles belonging" to the decedent, and one Dodge 1936 coupe and one Ford 1932 coupe. From a decree in favor of the plaintiff, the defendants, with the exception of W. J. Senne who did not appear, have appealed.

In the original complaint it is alleged that the plaintiff is a Mexican by birth and that prior to 1931, when he was a youth of the age of 16 years, he sustained injuries to his left hand, and was, prior to August 21, 1931, awarded compensation by the California Industrial Accident Commission amounting to approximately $3,600, payable in installments at the rate of $70.08 per

month for 52 months. On the trial the complaint was amended to show that he was 26 years of age at the time of the accident and that the award was $2,444.64.

It is alleged that prior to the month of August, 1931, the decendent, Bessie Potier, then of the age of approximately 45 years, was residing in San Francisco, California; that while living there she became acquainted with the plaintiff "and obtained knowledge of the aforesaid award"; that on or about the 21st day of August, 1931, she stated to plaintiff that she was the owner of a one-half acre tract of land in Portland, Oregon, "with good soil, a residence, some buildings, suitable for a small dairy business which required the services of a man with money to establish the business in the purchase of cows, furniture and dairy equipment, and in all of the value of $2,500, * * * that said property was encumbered by a $1,000 mortgage, delinquent taxes and other indebtedness which she was unable to meet and pay and on account of such inability was in danger of losing all of the same"; and that on or about the 21st day of August, 1931, Bessie Potier made the following offer to the plaintiff:

"That plaintiff pay to her $450.00 immediately and pay to her the aforesaid award installments as he should receive them to the full amount of $2,450.00, go with her to said property and the two of them jointly possess and operate the same until one of them should be taken by death and that upon such death all of said property together with all improvements, increase, accumulations and profits thereof should be and become the sole property of the survivor of them; and said Bessie Potier offered and proposed further that the title to said property during their lives could be held by either one of them or both of them, and that whichever method was pursued the one so holding such title

would so hold it in trust for the use and benefit of both of them according to the terms of the above stated offer and proposition; * * *''

It is next alleged ''that plaintiff then on said date immediately accepted the aforesaid offer'' and stated to Bessie Potier that ''as he was a minor and unfamiliar with title procedure that she hold such title upon the trust terms aforesaid''; that in pursuance of that agreement, plaintiff paid to Bessie Potier $450, and thereafter paid to her the remainder of the $2,450 as he received it; that the two of them during the month of August, 1931, moved to and took up their residence on the tract of land hereinbefore referred to, and thereafter, until the death of Bessie Potier on April 22, 1944, continued to jointly possess and occupy the land ''as a home and to operate said dairy, cultivate the soil, raise chickens and otherwise jointly work for their living necessities, improve and increase the said dairy herd, build a dairy barn and make other improvements and additions to said property; paid off all the aforesaid mortgage incumbrances and other indebtedness''.

It is then alleged that a few days after the death of Bessie Potier, plaintiff ''attained the knowledge that'' she, while on a visit to her sisters in California, on January 4, 1941, made a will in which she designated the plaintiff as beneficiary ''to the extent of only 'all of my livestock, my dog, and one hundred and fifty dollars in cash' '', and left all the remainder of the property to the defendants; that said will has been admitted to probate and Maybell Potier appointed executrix thereof, and that she has instituted proceedings in the probate court for the sale of the property claimed by plaintiff.

The relief which plaintiff seeks has been herein-

before stated. All the material allegations of the complaint were put in issue by the appearing defendants.

On October 21, 1930, Perez sustained an injury in which he lost the fingers of his left hand. No final award was made by the California Industrial Accident Commission until March 29, 1932, at which time he was awarded $18.52 a week for 132 weeks, aggregating $2,444.64, of which amount $1,259.36 had on that date been paid. Perez had known the decedent and her two sisters, defendants herein, for approximately one year prior to the alleged agreement of August 21, 1931. During the greater portion of this time he had lived with either the decedent or her sister, Maybell. From about March until August, 1931, he lived in decedent's home. While there he met W. J. Senne. A short time prior to August 21, 1931, Bessie Potier and Mr. Senne came to Portland to inspect the tract of land here in controversy. On this trip, according to Senne, Bessie Potier "suggested we marry but I did not agree because of my age." He was then 71 and she was 43 years of age. It was after their return to San Francisco that the alleged agreement was made.

On or about August 21, 1931, Perez withdrew from the bank his entire account, amounting to approximately $458. He turned this money over to Bessie Potier. About the same time she sold her furniture in the flat, realizing therefrom $125 to $200. They left San Francisco for Portland on August 21 or 22.

Perez gave the following testimony concerning the agreement which he claimed that he had with Bessie Potier:

"Q. Go ahead and state what conversation you had with her about this Portland property.
A. She told me about this property she had in

Portland; she told me she didn't have no money to pay the mortgage on the place and the taxes and things like that, so then she asked Senne to come up to Portland with her to see the property. When she went back, well, she told me about it, if I wanted to put my money in with her, it will be her home for life, I was getting compensation, to get all the money what I had in the bank, give it to her and help her pay the bills, or otherwise she would probably lose the place. So I told her, 'Well, I will think it over,' and the next day I told her, 'All right, I agree to that.'

Q. Agreed to what?

A. About giving her the money and my compensation.

Q. And what were you to get?

A. Well, she said 'if anything happened to me, the property will be for you, whatever we got, livestock and everything.'

Q. Did she know anything about your having any money in the bank?

A. Why, yes, I told her. She asked me to get the money out and give it to her, so I did, the next day after she talked to me about the property."

A little later in his testimony on direct examination, Perez gave the following version of the agreement:

"A. She came back to San Francisco with Mr. Senne and then she talked to me about putting my money in, she had an acre of land up here and a house and a little barn, and then she told me if I put my money in, it would be a good place to raise chickens and cows and raise the vegetables we needed. So I agreed to that and I says, 'Well, what am I going to get out of it; am I going to get any pay for it or anything?' 'Well,' she said 'there will be a place for both of us as long as we both live, and whoever dies first will get the place and the stock, what-

ever there is in the place.' So I agreed to that. The next day I went and got the money from the bank and gave it to her.''

The tract of land here involved is 71 feet by 209 feet, slightly more than one-third of an acre. Although it was appraised in the probate proceedings at only $2,200, it was stipulated on the trial of this case that it was of the approximate value of $3,000.

Upon arriving in Portland Bessie Potier purchased the necessary furniture and equipment for the house and she and Perez took up their residence there the latter part of August. In the early part of September, they purchased two milch cows at $45 apiece. Then in November they purchased two additional cows at $65 apiece. These four cows, according to Perez's testimony, were bought with the money which he gave to Bessie Potier. In March of the following year, two more cows were purchased at $85 apiece, and these were paid for out of the proceeds realized from the sale of milk.

Perez stated what he ''did on the place'', as follows: ''Well, I took care of the cows, and spaded the garden, split wood, and helped her do some work around the house, helped her do the washing. Whenever she wanted to wash some clothes, I helped her. Take the cows to the pasture and bring them in and go out and cut some grass for them, by hand. * * * Fixed fences and spaded the little piece of ground left there.'' He also collected from the customers to whom milk was delivered. Bessie Potier milked the cows, helped take care of the milk and drove the car while Perez delivered the milk to their customers. She also did the housework.

No salary was paid to Perez but Bessie Potier gave him "the money to buy whatever I needed." She also gave him money to send to his sister in Mexico. This sister was dependent upon him for her support. When asked how much he had sent to her, Perez answered, "I send her sometimes fifteen or twenty dollars, or twenty-five", but he had no idea of the total amount that he had sent to his sister, or how often he had sent her money.

Each year from 1932 to 1939, inclusive, Bessie Potier spent from three to four weeks with her sisters in California. She was in California also from October, 1940, until April, 1941, about seven and one-half months. During this period she underwent a major operation and also executed her last will. The evidence is not clear whether she returned to California again in 1941, but she spent considerable time there in both 1942 and 1943.

Mr. Perez testified that prior to 1940 Bessie Potier hired someone to do the milking while she was in California. He stated: "We pay them ten or fifteen dollars a month and room and board,—paid house,—room and board for him and his family." He further testified as follows:

"Q. Who was there the time she was operated on in California in 1940, who did the milking for you during that period?
A. Nobody. I did it, myself.
Q. You did it?
A. Yes, sir.
*     *     *     *     *
Q. How long did you do that?
A. All the time she was in California.
Q. On that long trip?
A. Yes, sir. And then I learned to operate the car myself.

Q. And did you deliver the milk by yourself?

A. I delivered the milk and do all the work that was necessary to be done around there all by myself, * * *."

On rebuttal, Perez gave the following testimony:

"Q. Now, she [Maybell Potier] said, 'My sister always did the milking.' Did Bessie do the milking after she got sick in 1941, or not?

A. No; she got some neighbor to come and do it.

Q. Who was he?

A. Mr. Arneson and Mrs. Arneson.

Q. How much did you pay them for milking the cows?

A. The first month I paid them sixty.

Q. Sixty, or sixteen?

A. Sixty dollars a month.

Q. Sixty dollars a month?

A. Yes.

Q. When was that?

A. When Bessie went away to California.

Q. When she was away at California.

A. When she went away to California the first month, and then after she came back she wasn't able to do the milking so I kept hiring these people to milk the cows.

Q. Did you pay them by the week or by the month?

A. I paid them by the month.

Q. How many months did you pay them sixty dollars a month?

A. Well, I paid the first month when Bessie was away, I paid them sixty dollars a month the first month, and then after that I paid them thirty dollars a month and two quarts of milk a day.

Q. And that was all the time that Bessie was down in California for the operation?

A. Yes, sir.''

While Bessie Potier was in California, Perez collected the money for the milk but did not send any of it to her. He testified that he used some of it to pay the expenses in connection with the property and to buy feed for the livestock and gave the balance to her when she returned to Oregon.

After Bessie Potier and Perez moved to Oregon, Senne spent from one month to six months each year with them. In 1937 he spent five or six months with them, and was there at the time of the death of Bessie Potier. He stated in his deposition that he "helped a little with work for my living"; and that he had "paid out two or three hundred dollars for material toward fixing the house and improving the place, and a little money now and then, to help them as they had a hard time at times to meet all of the expense for feed, grain, and payments." On direct examination Perez was asked "whose friend Mr. Senne was", to which he answered: "Well, he was a pretty good friend of Mrs. Potier. He came to see her more than he did me, because it was kind of, the way I figured it, according to conversations they had, Mr. Senne wanted to marry Mrs. Potier."

On direct examination Perez testified that Senne left Portland "right after we buried Mrs. Potier", and that he had not heard from him since he left. On cross-examination, he gave the following testimony:

"Q. You spoke about Senne staying how long after Mrs. Potier died?
A. Oh, a few days.
Q. Has he been back since?
A. No, sir.
Q. You are sure of that?
A. Yes, sir."

. After his attention had been directed to a copy of a claim for $258.71, dated September 25, 1944, which Senne had filed against the estate of Bessie Potier, he admitted that Senne was in Oregon at the time the claim was filed, and also admitted that he went with Senne to Mr. Martin's office, where the claim was prepared.

Marie Potier visited her sister Bessie in Oregon from three to six months "nearly every year". Maybell Potier visited Bessie only two or three times prior to 1944. She came to Oregon in March, 1944, and remained with Bessie until her death.

In August, 1940, Perez consulted Charles W. Redding, an attorney in Portland, now circuit judge, about some trouble he was having with Bessie Potier. Asked why he happened to go to see Mr. Redding, he said:

"A. Well, because Miss Potier after my money ran out, well, she was going to take somebody in, is how it happened we went in to see Judge Redding, Mr. Redding, whatever his name is.
Q. When did that money run out?
A. I can't exactly remember what day it was it run out.
Q. This letter is dated August 27, 1940. That is the correct time you went to see Mr. Redding, —wasn't it?
A. I don't remember exactly what day was it.
Q. Well, was it in 1940?
A. Somewhere there; I don't remember exactly what day was it.
    *       *       *       *       *
Q. Now, did Mrs. Potier tell you to get away from out there at that time?
A. Not exactly.
Q. What did she tell you?
A. Well, we had a little talk there about how things were going, we were running the business, but then I thought well—

Q. (interrupting) Not what you thought, but what did you say and what did she say; what did Bessie say to you?

A. Well, she say I better look for a job, go some place else. That is why I went up to see Judge Redding.

Q. Bessie told you you had better go to look for a job and get some place else to live?

A. Yes.

Q. That was in 1940. What did you say?

A. Well, I didn't say nothing. I said, 'I will.'

Q. Oh, you said you would?

A. Yes, like I promised before.

Q. What is it?

A. Like I promised her before, I would get a job."

Mrs. Mae Springsteen testified that Mr. Redding advised Perez that there should be a written agreement between Perez and Bessie Potier. She further testified:

"Q. Then all of the agreement they had was fixed up in black and white by Mr. Redding?

A. No, Mr. Redding didn't have anything to do with it at all, only his advice.

Q. I thought you said they were fixed.

A. Well, Bessie and Charley [Perez is referred to as Charley] fixed them.

Q. Oh, Bessie and Charley fixed up the papers?

A. Yes.

Q. Did you hear them talking anything about giving Charley any calves or anything at that time.

A. At that time?

Q. Yes.

A. I wouldn't say positive that there was any conversation concerning calves. I think the stock all belonged to Charley.

Q. You thought that?

A. Well, it was considered that way, just from conversation."

Perez testified that he had heard Mrs. Springsteen testify that there was an agreement in writing between him and Bessie Potier. He then gave the following testimony:

"Q. Well, all right. Did you have?
A. Well, we might have had, but she kept it if we did have.
Q. But she kept it if you did have?
A. Yes.
Q. Well, did you have?
A. Yes.
Q. Well, where is it?
A. Well, how do I know. I didn't have the keys.
Q. Who made it, who drew it up for you?
A. What do you mean, who wrote it?
Q. Who wrote the contract up?
A. Well, Bessie wrote the paper.
*      *      *      *      *

Q. When you made this agreement in Portland you fixed up everything, is that right?
A. Yes, she went ahead and fixed it up.
Q. You had everything fixed up when you made the agreement in Portland?
A. Yes, sir."

The letter from Mr. Redding was dated August 27, 1940. It was not introduced in evidence and the record does not disclose its contents.

At the close of the direct examination of Perez, he was asked if there was anything else he wanted "to say about this contract [referring to the alleged San Francisco agreement] or this conversation you had with her that I haven't asked you about", to which he volunteered the following answer: "Well, I didn't say anything to Mr. Martin about agreement her and I have in California, because he did never ask me anything about it." This is the first time, as far as we

have been able to ascertain, that Mr. Martin's name had been mentioned. Mr. Martin was a deputy city attorney of Portland.

Immediately after Bessie Potier's death, Mr. Senne and Perez went to see Mr. Martin. Perez testified that he went to see Mr. Martin about filing a claim against the estate of Bessie Potier, deceased. He stated that neither he nor Mr. Senne told Mr. Martin about "this California deal". He further testified as follows:

"Q. Do you know why Mr. Senne didn't say anything about that or you didn't say anything about it to Mr. Martin?
A. Because he didn't ask it.

\*  \*  \*  \*  \*

Q. Mr. Senne didn't say anything about a contract of any kind when you were talking to Mr. Martin, did he?
A. No, sir.

\*  \*  \*  \*  \*

Q. Then when you went down to Mr. Martin to see about this, you told him what happened, didn't you?
A. What happened about what?
Q. Well, you told him what the facts were about any contract or relation you had with Mrs. Bessie Potier, didn't you?
A. Yes, sir.
Q. He asked you what the facts were, didn't he?
A. Yes, sir.
Q. And you told him what the facts were as you understood it?
A. Well, I guess I did.
Q. You think you did?
A. Yes, sir.
Q. But you didn't say anything about this agreement?
A. No, sir."

An inventory of the partnership personal property on the tract of land in question was prepared by Mr. Martin, signed by Perez and filed. Mr. Martin also prepared a claim for Mr. Perez against the estate of Bessie Potier, deceased, in the sum of $7,020, of which amount $2,400 was for money which Perez had loaned her, and the balance was for labor performed by him. This claim was signed and sworn to by Perez and filed in November, 1944. In regard to these matters, Perez testified as follows:

"Q. Now you testified the other day the reason you changed your story from a partnership, as you first alleged, and then a claim as you next filed, to a claim now that you had an agreement with Bessie whereby you were to have the property after she died—where did you say that you changed that story?

A. Where I said?

Q. Yes; you changed it now. When you went to Mr. Sandblast's office, is that it?

A. Yes.

Q. You never changed it before, never thought of it before?

A. No, sir.

Q. After you talked to Mr. Sandblast then you decided that you had an agreement with Bessie that she was to give you the place?

A. Well, I explained to him how that was done.

Q. Well, that is the first time you ever said anything to anybody about it, is that right?

A. Yes, sir.

&ast;  &ast;  &ast;  &ast;  &ast;

Q. You never talked to Mrs. Springsteen about that?

A. What shall I say to the neighbors all about my business?

Q. You didn't talk to your neighbors about your business then?

A. Not about that. I didn't say anything to them about that.''

In view of this testimony it is apparent that Perez did not tell Mr. Redding of his alleged agreement with Bessie Potier when he consulted him. He, with Senne, consulted Mr. Martin several times and neither of them ever mentioned the agreement to Martin.

Mrs. Springsteen, on direct examination, testified that she had lived next door to Bessie Potier and Perez since 1932; that on a trip she made with Bessie Potier to the town of Sandy, the following conversation took place:

" * * * and I said to Bessie, 'I can't see where Charley is going to get anything out of this. He has put his money into it and he is still putting his work into it, making the same sacrifice as you are.' They both sacrificed equally. And she said, 'Well, I would be willing to put the place in Charley's name but he doesn't want me to, but,' she says, 'he will have a home as long as he lives.' She says, 'That is all I will have out of it, and we expect we some day will have to bring Mr. Senne here and take care of him; he is getting old and feeble,' and she said, 'This will be his home, too.' ''

There is nothing in the record to disclose in what year this colloquy occurred. Reference has already been made to Mrs. Springsteen's statement that it was considered from conversations that "the stock all belonged to Charley.''

This witness then went on to state that Bessie Potier was having difficulty in getting an HOLC loan; that at first her application was rejected, and that she became discouraged and offered to deed the property to Perez but he declined. We have hereinbefore referred to

Mrs. Springsteen's testimony about the written agreement between Bessie and Perez.

Mrs. Martha Jameson, another neighbor, testified that she had known Bessie Potier and Perez since 1939; that Bessie Potier referred to the place as "Charley's and my place"; that while she was over at her place cleaning up, preparatory to moving in, Bessie Potier came to her house and explained to her about "Charley", stating, "I guess she wanted me to get it straight." She also stated that she had not talked to Bessie Potier about "their business arrangement"; and that in January, 1944, some three months before Bessie Potier died, Bessie told her that she had "made a will out down in California." She further testified:

"Q. How did she happen to tell you that?
A. She was wondering how—she was sorry for Charley because everything was going to be left on his shoulders to continue with and she was wondering—then she brought up about the will.

*       *       *       *       *

Q. What was it that Mrs. Potier said about her will?
A. She said that—she mentioned that she had a will made out in California and that she was wondering if she had done right by making out the will the way she did. I don't know how she made it up.
Q. She didn't tell you how she made it up?
A. No.

*       *       *       *       *

Q. Did she make any other comment about it?
A. Only that she was so sick and she was sorry about poor Charley because everything was going to be left on his shoulders to do."

Guy M. Rader, an automobile mechanic who operated a garage seven or eight blocks from the tract of

land here involved, testified that he became acquainted with Bessie Potier while she and her husband were residing there; that he became acquainted with Perez shortly after Perez moved to Oregon, and that he had done a great deal of work for Bessie Potier repairing her car. In answer to a question as to what conversation he had had with Bessie about "the cows and automobile and the little lot out there", he said:

"Mr. Perez came down and made the statement of his cows and his place and his car to me, and I didn't know whether it was his or whether it wasn't. I knew she had owned it before, so when she came down I asked her, I said, 'Is this a partnership business of yours? Are you people married or how are you working this?' I said, 'It is being made like that.' And she said, 'No, it isn't.' She said, 'That is just his way of speaking.' That is what she told me."

He said that Bessie had told him that Perez was working for his room and board, and that "she was giving him some calves and a start in the cattle business."

Marie Potier's testimony was taken by deposition. Direct and cross-interrogatories were submitted to her, and these were answered in her own handwriting. She testified in part as follows:

"Q. Did Perez have any interest in the cows, or did Perez have certain of the cows for himself and Bessie have certain of the cows for herself?

A. Yes, he had certain cows he claimed for his own. Bessie had certain cows she claimed as hers also calves. Perez also. She would show me which were hers.

Q. Tell all you know about any arrangement between Bessie and Perez, if any, concerning the cows.

A. Bessie told me the arrangement between her and Perez. He could buy and sell his own cows

which were divided about half and half between them, and they would each raise the heifer calves for cows which was what they done. That was the only arrangement between them as the ground was my sister's. Bessie told me this when Perez sold a cow he would keep the money himself.

＊　　　＊　　　＊　　　＊　　　＊

Q. Did Bessie ever tell you anything about why Perez stayed out there and what he was doing and what he was to receive, if anything?

A. Perez would always pity himself and would say to Bessie he could not go any place to work on account of his hand and he would not try to work anywhere. He did receive the same as my sister in living, only it was my sister Bessie's land which he had the use of the ground for his cows.

Q. Did Bessie ever tell you whether or not Perez was to have any interest in the house and ground? If so, what did she say?

A. My sister Bessie told me at different times Perez had nothing to do with the house or grounds.''

She further stated that when she was visiting her sister Bessie, she did not pay for room or board, but she did ''most all the baking of bread, cooked most all the meals, washing, ＊ ＊ ＊.'' She said that she had loaned her sister Bessie $400, and that her sister told her that Perez had $400 when he came to Portland. Perez admitted that Bessie had received money from her sister Marie at different times, but did not know the total amount received.

Maybell Potier testified that her sister Bessie told her that she had received $450 from Perez before coming to Oregon, and that ''she intended to pay it back in some way''; that some of the cows belonged to Perez and some to her, and that Bessie ''would say,

'This one belongs to Charley, and this one and that one is mine.' " She said that in 1938 or 1940 her sister had told her that four cows and a couple of heifers belonged to him.

W. J. Senne's testimony was taken by deposition. Only direct interrogatories were submitted. His answers are typewritten; they are prolix, and many times not responsive to the questions. At the time he gave his testimony, he was 85 years of age. He stated that after he "did not believe we should marry", Bessie Potier discussed with him the question "of financing herself and saving the place" by getting Perez to help her. Some of his testimony is as follows:

"Q. Did you hear any statements made by Bessie Potier in San Francisco, Calif., before Charley and she came to Portland, regarding any agreement between them; if so, state briefly.

A. August 19th or 20th when she asked Charlie for sure to put in his money and the compensation he was receiving, Charley asked if he would get his money back or something like that or how she would do for him if he let her have the money and compensation. Bessie said that she would make it so that they could make a living if she could save the property and that she would work with him and if he would let her have the money he had in the bank they would have a home for life and when one died the other should have the property including the cows, stock and all on the place, and they could make a success if he would let the money go into the place, by selling eggs and milk. I remember clearly that she said it was for life of both and the one who lived the longest would own the property.

       \*       \*       \*       \*       \*

Q. If you had any conversation with Bessie Potier concerning her making some disposition of the

property by way of turning it all over to Charley Perez, please state in detail.

A. Right after they had the Home Loan take up the old mortgage she said that prior to then she had intended to turn the place over to Charlie altogether and told him that she intended to do this and return to San Francisco, but that Charlie encouraged her and urged and insisted on continuing as they had. She said Charlie promised to get outside work to help meet the debts if necessary. She said she offered him the title after she had failed to get a loan and for him to sign the mortgage himself, but he still insisted that she should continue as they had been and make a home for themselves and not to give up as he was sure they could make it go. Bessie told me this."

We have referred to the decedent as Bessie Potier. She is variously referred to in the evidence as Bessie Potier, Miss Potier, Mrs. Potier and Bessie Toland Potier. She had been married to Joe E. Toland, and the property here in dispute was conveyed to Joe E. Toland and Bessie Toland, his wife, as tenants by the entirety. It appears from the record that Joe E. Toland was living at the time of the trial but there is nothing to show whether he and Bessie had been divorced. Under date of December 29, 1931, Joe E. Toland conveyed to Bessie Toland all the interest which he had in this property. This deed was not recorded until April 8, 1932. It therefore appears that on August 21, 1931, Bessie Potier was not the owner of this tract of land in fee simple. It was then owned by Joe E. Toland and Bessie Toland, either as tenants by the entirety or as tenants in common, depending upon their marital status.

Under date of May 8, 1929, a mortgage was executed on this property in favor of Lilly J. Edwards

for $800, and recorded June 3, 1929, payable three years after date. This mortgage was satisfied of record on February 20, 1934. On February 16, 1934, a mortgage in the sum of $955, payable to the Home Owners Loan Corporation, was placed on this property. This mortgage was payable at the rate of $10.13 monthly, including 5% interest, and was satisfied on January 5, 1943. When Bessie Potier and Perez came to Oregon in August, 1931, all the taxes on the property except the 1930 taxes, payable in 1931, had been paid. These taxes would not become delinquent before November 5, 1931. § 69-720, Oregon Code 1930.

All the payments made to Perez as compensation for the injuries which he suffered in California were received by him prior to July, 1933. It would appear, therefore, that none of the money which he received was used to pay the principal on the indebtedness secured by the Edwards mortgage, and that not much, if any, of Perez's money was used to pay the interest thereon for the reason that in 1934, when the mortgage was satisfied, the unpaid interest totaled $155.

The question naturally arises as to what became of the money which Perez had at the time he came to Oregon and the payments made to him later. According to the circuit court's opinion, Perez gave $458 to Bessie Potier in California and thereafter received $1,703.84 as compensation for his injuries. Perez testified that the first four cows which they purchased were paid for with the money which he had given to Bessie Potier, the purchase price of these four cows being $220. He also testified that Bessie had paid $25 per month out of his compensation money on the purchase price of an automobile which she bought in July, 1931. Perez also sent money from time to time to his sister in Mexico, who was dependent upon him.

The chickens and all the cows, except the first four, were paid for out of the income from their operation. That was also true of most of the improvements made on the place. Perez testified that at the end of the year 1931, the cows were producing twenty gallons of milk daily, which was being sold at eight cents a quart. How much of the milk was actually sold, the record fails to disclose.

While Bessie Potier was in California for seven and one-half months in 1940 and 1941, the cows were producing at least one hundred quarts of milk a day. During this time Perez received 14 cents a quart, which, if all the milk was sold, would average $14 a day, and for seven and one-half months would amount to $420 a month, or in excess of $3,000 for that period. He attempted to account for the money which he received by stating that he had used it to buy feed and to pay the general operating expenses around the place. He thought he had paid Bessie about $125 on her return.

At the time of the trial Perez had been in the United States about 30 years. He claims, however, that he could scarcely read or write, but he admitted that he kept an account of all their customers, prepared the monthly statements, and made the collections. He stated that he had no idea how much milk had been sold or how much the monthly receipts were, but that all the money which he had collected, except what he paid for feed, he delivered to Bessie Potier.

We have hereinbefore referred to the fact that Perez was injured in October, 1930, losing all the fingers on his left hand. At that time he had about $500 in the bank. Between the dates of the injury and his departure for Oregon, he had been paid between $700 and $800 in compensation and had spent all that

money, together with the money he had in the bank, except about $458, for living expenses. Because of his disability he could not do the work previously performed by him and other employment was then difficult to obtain.

The HOLC loan was procured by Bessie Potier in February, 1934. According to several witnesses, she had considerable difficulty in securing this loan. Perez, Senne and Mrs. Springsteen testified that her application was at first rejected; that she became discouraged and offered to deed the property to Perez, and that had he accepted a conveyance of the property she expected to return to California. This is the only evidence of any offer by her to deed the property to Perez. There is no evidence to support the allegation of the complaint that at the time of the alleged agreement "Bessie Potier offered and proposed further that the title to said property during their lives [Bessie Potier and Perez] could be held by either one of them or both of them, and that whichever method was pursued the one so holding such title would so hold it in trust for the use and benefit of both of them according to the terms of the above stated offer and proposition".

We shall now refer to the will of Bessie Potier which she executed in California on January 4, 1941. Under the provisions of this will she gave her 1936 automobile to Senne, which was appraised at $350, and $200 in cash; to her sisters Marie and Maybell she gave all her "household furnishings", appraised at $50, $250 each in cash, and the residuum of her estate; to Perez she gave "all my livestock" consisting of six cows, three heifers and four calves, appraised at $805, her dog, and $150 in cash. She ordered that her real property, appraised at $2,200, be sold and that the money be-

quests hereinbefore mentioned be paid from the proceeds of the sale. Her entire estate was appraised at $3,540. In addition to the items mentioned were the following: Milk house equipment, $35; jewelry, $25; poultry, $10; hand tools and equipment, $15, and 1932 Ford coupe, $50.

Senne, in his deposition, gave the following testimony about the conversation he had with Bessie Potier relating to the will:

"Q. Did you ever see the will alleged to have been made by Bessie Potier, if so, when, and any conversation by Bessie Potier.

A. A day or two before Bessie died she asked me to get the will for her and look it over. I did and said after I read it, 'That is not right and you know the will should be made out for Charlie and that the place is his if you die'. Then Bessie said to me, 'Get a lawyer so I can make another will and leave it all to Charlie as soon as possible'. I said 'I will do that Monday morning', but she passed away Saturday morning. She agreed to make out another will and was to have it all. I answered that was the right thing to do."

Perez, after his attention was called to Senne's testimony, stated that he had heard Bessie and Senne talking about the will and that Bessie told Senne that "she had a will made out and then Senne asked to see the will". He further testified as follows:

"Q. State what Bessie said at that time.

A. Well, she asked Senne—Senne read the will and then Mr. Senne told her that will wasn't right, he didn't think it was right on account of the agreement her and I had in California. So then she—

148

Q. (interrupting) Go ahead and state all of it.

A. Then she says, 'Well, you had better get another lawyer and bring him down here and I can make a will so I can make it out to Charley.' She called me Charley. And Senne said, 'I will. I will get a lawyer Monday.' And then Saturday evening about eleven o'clock she passed away.

\* \* \* \* \* \*

Q. State all that Mr. Senne said. Did he say anything else?

A. Mr. Senne said he didn't think it was right for her to make a will like that, and the way I had the agreement with her in California. He said, 'The way you have the agreement with Charley, it isn't right for you to make a will like that.' So she said, 'Well, if it isn't right you get a lawyer and I can make a different will. Then I can leave it all to Charley.' "

In his complaint, plaintiff alleges that "within a few days after the said death of Bessie Potier" he "attained the knowledge that the said Bessie Potier" had made the will here involved.

We are unable to reconcile the foregoing testimony of Senne and Perez, about what occurred two or three days before Bessie Potier died, with their actions subsequent to her death. If this incident actually had occurred, it seems incredible that they would not have mentioned the facts concerning the agreement between Perez and Bessie Potier to Mr. Martin. They consulted him a day or two after her death and Mr. Martin prepared, at the instance of Perez, the inventory of the partnership personal property to which we have already referred. They also consulted him a number of times thereafter. On one of these occasions, in September, 1944, Martin prepared the claim which Senne filed

against the estate. In November of the same year, Perez again called upon Martin who prepared, at his request, his claim for money loaned to and services performed for Bessie Potier.

At the time Bessie Potier died she weighed between 65 and 70 pounds and had not eaten anything substantial for weeks before her death. She "had so much trouble with her breathing she couldn't eat".

Maybell Potier testified that Senne had advised her sister Bessie that her will, which was executed in California, would be invalid in Oregon, and furthermore, that Maybell Potier, who had been named executrix of the will, could not qualify in Oregon because she was a resident of California, and that Senne had persistently urged Bessie to obviate these defects by executing a new will. The will was executed more than three years before Bessie Potier's death and at a time when she was preparing to undergo an operation for cancer. For five or six months prior to her death she was unable to do much work and she must have been aware of her serious condition. The will evidences an intention on the part of the testatrix to deal fairly with those to whom she was indebted.

Upon Bessie Potier's death, Perez took charge of the livestock and ever since that time has had them in his possession, disposed of the milk and kept the proceeds therefrom, without accounting in any way to the executrix of the estate. The cattle were kept on the real property here involved until about November, 1944, when they were removed to the country. Perez stated as his reason for their removal that Maybell Potier, who was living on the place, was hostile to him. The real reason for taking the cattle elsewhere, and which he finally admitted, was that the inspection

report of the Oregon state department of agriculture, dated November 1, 1944, condemned the dairy "for further use as prohibited under penalty of law until the same has been put in a sanitary condition in compliance with the" provisions of §§ 99-2246 and 99-2247, O. C. L. A.

██ Plaintiff seeks specific performance of an alleged oral contract. That remedy is not available as a matter of absolute right but as a result of the exercise of sound judicial discretion. *Harris v. Craven*, 162 Or. 1, 19, 91 P. (2d) 302. Before such a contract will be enforced, plaintiff must establish its existence, and that it was definite, certain and reasonable in its terms, by clear and satisfactory evidence. *Harris v. Craven*, supra, and cases cited; *Booher v. Brown*, 173 Or. 464, 146 P. (2d) 71. Because one of the parties to the alleged contract is dead, and her version of the transaction is not available, it is of the utmost importance that the evidence in behalf of the survivor be carefully scrutinized.

It may be inferred from plaintiff's contentions, although not too clearly, that Bessie Potier was to devise the real property to Perez if she predeceased him. Such an understanding would involve an agreement by her to make a will leaving the real property to him. This property was not purchased with partnership funds. Bessie Potier owned an interest in it at the time of the alleged contract. She acquired complete title thereto when Joe E. Toland conveyed his interest to her. It does not appear that any of Perez's money or that any of the money from the income of the property was used in the acquisition of Mr. Toland's interest. The HOLC mortgage was paid at the rate of $10.13 a month. It may be assumed that these monthly

installments and the taxes on the property were paid from the income therefrom. There is, however, nothing in the record to show that these payments were any more than a reasonable rental for the property.

Some of the reasons why it is very improbable that there was any agreement between Bessie Potier and Perez that the latter was to have the real and personal property, upon the death of Bessie Potier, are the following:

(1) At the time of the alleged agreement Bessie Potier was not the owner in fee simple of the real property in question; it was owned by her and Joe E. Toland, as tenants by the entirety or as tenants in common.

(2) The property was not encumbered as alleged in the complaint "by a $1,000.00 mortgage, delinquent taxes and other indebtedness". There were no delinquent taxes against the property. The mortgage was only for $800, and there could not have been over two years' interest, if any, due on the mortgage indebtedness.

(3) Bessie Potier was at the time of the alleged agreement 43 years of age and in good health, and Perez was 26 years of age, and it is very unlikely that she intended to make an agreement binding herself to live on the place until the death of one or the other of them.

(4) The amount of compensation which Perez was to receive was not determined until March 28, 1932, seven months after the date of the alleged agreement. According to the allegation of Perez's complaint, he was to pay her $450 "immediately" and the balance of $2,000 in installments as they were received. The total amount received after the alleged agreement did not exceed $1,703.84.

(5) The 1929 mortgage on the property was not paid from money furnished by Perez but by procuring a new loan in 1934 in a sum greater than all the encumbrances existing in August, 1931. This latter mortgage was paid with the income from the property.

(6) In 1940, when Perez, according to his testimony, was told by Bessie Potier to leave the property and find work elsewhere, he agreed to do so and did not then claim any such agreement as he now alleges.

(7) When he consulted Mr. Redding for legal advice in 1940, he did not tell him of any such agreement with Bessie Potier.

(8) Perez testified that after he had consulted Mr. Redding, Bessie Potier wrote an agreement which was signed by both of them. He failed to state the contents of that agreement.

(9) After Bessie Potier died, Perez, in company with Mr. Senne, consulted Mr. Martin, an attorney, on numerous occasions. Martin first prepared for Perez an inventory of partnership personal property, and several months later a claim against the estate of Bessie Potier, deceased, both of which documents were signed by Perez and filed. Neither he nor Senne ever told Martin about any such agreement.

(10) Both of Bessie Potier's sisters testified that Bessie had told them that Perez had no interest in the real property, but that he did own some of the livestock. Testimony of a similar nature was given by the garage man, Mr. Rader. Mrs. Springsteen stated that she understood that Perez owned the livestock.

(11) In her will, executed in January, 1941, Bessie Potier left all the livestock to Perez, but not the real property. This will must be considered as evidence adverse to the contention made by Perez.

(12) The contradictory testimony given by Perez, as hereinbefore pointed out, casts doubt on the correctness of his testimony relative to the alleged contract. In addition to such testimony, we find that his memory was very poor on many matters, such as how much money he had sent to his sister, the monthly receipts from the milk, and many other things.

■■ We are of the opinion that plaintiff has failed to prove the alleged contract by clear and satisfactory evidence. The record tends to establish a partnership between him and the decedent in their operations, but inasmuch as he has received, as legatee under her last will and testament, all that he would have received under such partnership arrangement, there is no relief which can be granted in this proceeding.

The decree appealed from is therefore reversed and the cause remanded with directions to the lower court to dismiss the proceeding, neither party to recover costs in this court.