Submitted on briefs October 16, 1957, reversed February 28, petition for rehearing denied March 19, 1958

## MOORE *v.* FRITSCHE ET AL

322 P. 2d 114

Raymond D. Matthies, Albany, Bruno C. Linde, Portland, and Haas & Schwabe, Portland, filed briefs for appellants.

Melvin Goode and Willard Bodtker, Albany, filed a brief for respondent.

PERRY C. J.

This suit was brought by the plaintiff Abbie Elizabeth Moore against the defendant Walter Kropp, administrator cta of the estate of Otto Snyder, deceased, and against the defendants Frank Koshmiter, Anna Fritsche, Else Rochlich, Rosmare Rochlich, Lorn

Rochlich, Klaus Rochlich, Jochen Rochlich, Minna Perscheid, and Giese Gunstman, legatees under the last will and testament of Otto Snyder, deceased, for a decree establishing a contract between plaintiff and said Otto Snyder, and ordering that the contract be specifically performed; and for a further decree restraining said Walter Kropp from making distribution of the estate pursuant to the terms of the will of Otto Snyder, deceased, and quieting plaintiff's title and right to distribution against the claims of the defendant legatees. From a decree in favor of the plaintiff the defendants Anna Fritsche, Else Rochlich, Rosmare Rochlich, Lorn Rochlich, Klaus Rochlich, Jochen Rochlich, Minna Perscheid, and Giese Gunstman have appealed.

◼ Plaintiff's claim is based upon an oral contract to make a will in favor of plaintiff in consideration of services rendered to the promisor, Otto Snyder, during his lifetime. It happens that in most cases which treat contracts of this type, and the present case is no exception, the promisor is dead and has died either making no will at all or making an invalid will under the statute of wills. In this state, however, such contracts have been held lawful, and specific performance of them has, under proper circumstances, been granted. When the existence thereof and breach by the promisor are properly established in evidence, and no adequate remedy is available at law, courts of equity will grant relief. *Tiggelbeck v. Russell, et al.*, 187 Or 554, 213 P2d 156; *Magness v. Magness*, 148 Or 44, 33 P2d 1005, and cases cited therein.

The complaint avers that on April 9, 1948, Otto Snyder (who will be referred to hereinafter as Otto) executed his last will and testament, bequeathing $5000 and his automobile to his nephew, Frank Koshmiter

of Indianapolis, Indiana, and devising and bequeathing the residue of the estate to the various sisters, nieces, grandnieces, and grandnephews, all of whom live in Germany, and are the defendants herein; that Otto died in Linn county, Oregon, May 2, 1955; and that the estate is now being probated in Linn County Court. The complaint further avers that the deceased died without having revoked the will drawn April 9, 1948, and without leaving a will or other instrument conveying the property to the plaintiff. These averments have been admitted by defendants. The heart of the complaint, all of which is denied by defendants, reads as follows:

"IV.

"That on or about the 16th day of June, 1948, in the City of Seattle, State of Washington, plaintiff and the said deceased, Otto Snyder, entered into a certain contract, whereby the said plaintiff agreed to come to the home of the said deceased, Otto Snyder, and to devote her time solely and exclusively to the making of a home, keeping house, doing the cooking, mending and washing for said deceased and to the taking care of said deceased during illness and looking after his general welfare and comforts so long as the said Otto Snyder should live; that the deceased, Otto Snyder, agreed with the plaintiff that if she would come to his home, make a home for said deceased, keep house, do his cooking, mending, washing, take care of him during illness and look after his comfort and general welfare, he would revoke the will hereinbefore mentioned and execute a new will devising and bequeathing to plaintiff upon his death all of his property, both real and personal, possessed by him at the time of his death. * * *

"V.

"That the plaintiff, under and pursuant to the terms and conditions of said contract, on or about

the 16th day of June, 1948, made a home for said deceased and continued so to do up to the time of the death of said deceased. That the plaintiff from and after the 16th day of June, 1948, and until the time of the death of said deceased, kept house for said deceased, did his cooking, washing, looked after his comfort and general welfare and nursed him during his illness and in every way performed the conditions of said contract on her part to be performed."

According to plaintiff's testimony, she and Otto met in May of 1948 in Spokane, Washington. Both had recently left their respective spouses; both had instituted divorce proceedings in the state of Washington in which interlocutory decrees had been entered, but neither had received a final decree. At the time of their meeting, plaintiff was employed as a chambermaid in a Spokane hotel. Otto, a tenant at the hotel, apparently took more than a casual interest in plaintiff, for he came to see her and brought her flowers in an attempt to get better acquainted. Shortly thereafter, conditions having become intolerable for plaintiff in Spokane by reason of her former husband, Otto suggested that she accompany him to Seattle. In Seattle plaintiff looked unsuccessfully for work and continued to see Otto regularly, although they resided at separate hotels. This relationship continued until the middle of June, 1948. It was at this time, as stated in the complaint, that the alleged contractual relationship came into existence. The plaintiff testifying as follows:

"A He told me if I stayed with him and kept house for him and cooked the way he was supposed to eat and be his companion until he died he would leave everything to me, as he had no relatives over here and none of her relatives

ever did anything for him, and he just had to have somebody, and I needed work too.

"Q Did you accept his proposition?

"A Yes, I did."

The evidence also discloses that Otto, while an active individual for his age, was not in the best of health; he had heart trouble, his diet was restricted by stomach difficulties, he had trouble with the circulation in his legs, and suffered from insomnia on numerous occasions. Otto's first wife had died, and he had trouble with his second wife. Also, he had executed a will prior to meeting plaintiff which was unrevoked at the time of his death.

The plaintiff testified that after the agreement was made, sometime in June, they rented a furnished house in Seattle where they resided for several months until they moved to Gladstone, Oregon, where a house was purchased and they lived there for a period of three years. During this period the plaintiff made a trip to Seattle. The evidence shows that during this entire period the plaintiff did the washing, ironing and general housework and received no cash wages. It must also be said that during the entire period up until Otto's death the couple apparently held themselves out as man and wife. Otto would refer to the plaintiff as "the Mrs." and introduced her to visiting friends as "Mrs. Snyder." When Otto sold the Gladstone house in 1951 he required plaintiff to sign the deed and she signed "Mrs. Otto Snyder." Plaintiff wrote her sister from Gladstone and told her that "she was married to Mr. Snyder and that she was very happy."

After the sale of the house in Gladstone they had a trailer constructed and thus began a pattern of activity which was to be maintained until Otto's death

in 1955. The theme of this pattern was best described in plaintiff's testimony: "Taverns and fishing." Plaintiff and Otto journeyed to Gold Beach, to Waldport, to Bend, to Waldport again, back to Bend and to California in 1952. In March, 1953, they returned to Waldport and later journeyed to Taft and Newport. In the spring of 1954 they once more travelled to Bend, later returned to Waldport and spent the winter of 1954 in Albany, Oregon. In May, 1955, Otto died from a heart attack. During these years they cultivated several acquaintances, some of whom appeared as witnesses for the plaintiff in this case. The proprietors of the trailer camp where Otto and plaintiff put up at Waldport, friends of theirs at Gladstone, plaintiff's son Thomas Moore, plaintiff's sister Marjory Porter, and plaintiff's brother and sister-in-law who had visited plaintiff in Gladstone; all appeared in her behalf at the trial.

Plaintiff testified to subsequent conversations concerning the alleged contract: Otto would tell her that everything was fixed, that he had made a will and everything would go to her since he had no one else. Nowhere in the conversations, as related by plaintiff, is there reference to any agreement between them pursuant to which Otto had "made the will" in her favor. And it must be remembered that this is not a proceeding to establish such a will—it is based on a contract.

The testimony of all the witnesses is replete with references to the disposition, by Otto, of his property, but that is all:

1. Mrs. E. S. Hislop:

    "Q. Did he [Otto] ever say anything to you regarding disposition or how he was to dispose of his property after he was gone?

    "A. Yes, he said he had worked hard for his

money, had come to this country with nothing, that he had people in Germany but he had made his money here and he didn't figure anyone in Germany had any right to it, because they hadn't helped him, and it would go to Mrs. Synder [plaintiff]."

There was never any mention of an agreement between Otto and plaintiff.

2. W. E. Hislop:

"Q. There is no question in your mind as to the general import of his word, as to who was to have his property?

"A. In my opinion, I think he intended to have Abbie have everything he had left when he died."

Again there was no reference to any agreement.

3. John Tanzer:

"Q. Did he [Otto] ever say anything to you as to how he was going to dispose of his property?

"A. Yes, he said he had no one here that meant anything to him but Abbie and Abbie would have whatever he had left at the time he passed away.

\* \* \* \* \*

"Q. He never made any indication either by express or implication, as to any agreement between him and Mrs. Moore he was going to leave everything to her?

"A. Well, as far as a will, I don't know."

4. Ann Tanzer:

"A. Well, he was quite proud of the money he had and he was going to leave it all to Abbie when he was gone."

5. Herbert Tanzer:

"Q. What did he say to you in regard to his property or financial affairs?

"A. The fact he had a farm at Pasco, that he had done quite well there and was proud of it, that he had been married, that his wife died and he had a wife after that and she took him for some money, that he now had a good wife and after he died she would have everything he had."

6. Jo Tanzer:

"Q. Did he ever mention how he was going to dispose of the property?

"A. Only that whatever he had would go to Abbie."

7. J. Starr:

"A. Well, it just seemed to me that he said that when he died Abbie was going to get everything he owned, that he had no one else.

"Q. Did he refer to a contract of any kind?
"A. No."

8. M. Porter:

"A. He [Otto] said that if anything happened to him that all his property would be left to Abbie."

9. M. Starr:

"Q. Will you tell the court, as nearly as you can remember, what Mr. Snyder had to say at that time?

"A. Well, just that when he died that Abbie would get everything because she had been so good to him."

All of the witnesses for plaintiff, with the single exception of the son Thomas Moore, were under the impression that plaintiff and Otto were married. Though some of them later found out otherwise, it appears that the conversations which they have re-

ported having with Otto occurred at a time when they were laboring under this erroneous impression.

■ We pause to note, the plaintiff has denied she and Otto cohabited during this period. Defendants, on the other hand, have countered with the proposition that it can be presumed, from the uncontradicted evidence that the couple held themselves out as husband and wife, that there was a meretricious cohabitation. Because there is no evidence of a meretricious relationship during their residency in Spokane or Seattle in 1948, when the claimed contract was made, and because the "holding out" as husband and wife did not commence until plaintiff and Otto moved to Gladstone in 1949, it is our view that the character of their alliance is immaterial as it relates to the paramount issues of the case. The defendants' claim that the court of equity should be closed to plaintiff because of her unclean hands is without merit. If there was evidence indicating Otto and plaintiff had been cohabiting illicitly during the period the alleged contract was made, or if there was evidence that future illicit cohabitation formed a part of the consideration for such a contract, defendants' argument might prevail. *Traver v. Naylor et al.*, 126 Or 193, 268 P 75. No such evidence exists.

■ From the above resume of the evidence, perhaps too fully set out, we may, we believe, rightfully assume the contract as alleged was entered into between the parties and fully and most adequately performed by the plaintiff, but, even so, specific performance may not be granted. Specific performance is not granted as a matter of right; its granting must rest solely in judicial discretion, controlled by equitable principles. *Perez v. Potier*, 179 Or 123, 170 P2d 343; *Harris v. Craven*, 162 Or 1, 91 P2d 302.

Since the oral agreement to will property is in

conflict with the provisions of the statute of frauds, "It is only in cases where the services performed are of an unusual character, involving elements other than the actual work itself, and where compensation in money would not be adequate, that specific performance of such an oral agreement will be decreed. *Roadman v. Harding*, 63 Or 122, 125, 126 P 993; *Cooper v. Colson*, 66 NJ Eq 328, 58 A 337, 338, 105 Am St Rep 660." *Wagner v. Savage, as Adm'r*, 195 Or 128, 150, 244 P2d 161.

This court has over and over again in this type of case approved the legal principles set forth in *Cooper v. Colson*, 66 NJ Eq 328, 58 A 337, 105 Am St Rep 660, and since the facts in this case closely parallel those of the case before us we deem it unnecessary to greatly extend this opinion. From this case, and the many opinions of this court, we must conclude it is established law that one who has performed services under such an agreement can generally be adequately compensated in an action at law, and it is only in those cases where the services performed are of such an unusual character that there is no monetary standard by which they can be valued, or those where the party complaining has so irretrievably changed positions, by reason of the agreement, to his disadvantage that to permit the other to refuse performance would accomplish a fraud, that specific performance is granted.

While the services performed by the plaintiff may have been arduous, we are of the opinion that they can be estimated as to their monetary value. Certainly there is no evidence in this case that the plaintiff changed her course of life, or chosen life-work, because of the agreement. The relationship of the parties may be summed up in the words of the plaintiff herself:

"* * * he just had to have somebody, and I needed work too."

While there can be no question of the plaintiff's faithful devotion to her duties, and the ability with which she performed them, we feel compelled on legal principles to reverse this case and let her seek her remedy in a court of law as did the plaintiff in *Wagner v. Savage, as Adm'r,* supra.

Reversed. Neither party to recover costs.