Argued and submitted August 18, 2011, in case CV06090108, affirmed; in case CV07020311, reversed and remanded with instructions to enter a judgment awarding damages in accordance with the jury's verdict March 14, 2012

Don KAZLAUSKAS,
*Plaintiff-Respondent*
*Cross-Appellant,*

*and*

KBBP, LLC,
*Plaintiff,*

*v.*

Terry W. EMMERT,
*Defendant-Appellant*
*Cross-Respondent.*

Clackamas County Circuit Court
CV07020311; A141575 (Control)

Terry W. EMMERT,
an individual,
*Plaintiff-Respondent,*

*v.*

Don KAZLAUSKAS,
an individual,
dba Victory Lane Farm, Inc.,
an inactive corporation,
dba D. Z. Investment Group,
*Defendant-Appellant.*

Clackamas County Circuit Court
CV06090108; A142077

275 P3d 171

David W. Melville argued the cause for appellant-cross-respondent Terry Emmert. With him on the briefs were Jeffrey M. Edelson, Markowitz, Herbold, Glade & Mehlhaf, P.C., and Law Offices of David W. Melville.

John M. Berman and J. Rion Bourgeois argued the cause and filed the briefs for respondent-cross-appellant Don Kazlauskas.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

### BREWER, C. J.

In these consolidated cases, both parties appeal respective judgments in favor of the other party, raising various assignments of error. In case CV06090108, plaintiff Emmert alleged that defendant Kazlauskas committed fraud concerning a loan that Emmert made to Kazlauskas relating to property known as the Stickney Road property. The jury found that Kazlauskas had committed fraud and ultimately awarded Emmert $108,800 in damages, which included $88,800 in disputed damages in addition to $20,000 that Kazlauskas admitted owing to Emmert. Kazlauskas appeals, raising numerous assignments of error. We affirm the judgment in that case without discussion.

In the other case, CV07020311, Kazlauskas alleged contract-based and fraud claims against Emmert concerning two properties containing horse-related facilities—the Victory Lane property and the Flax Plant Road property.[1] In that case, the jury determined that Emmert had breached the contracts concerning the Victory Lane and Flax Plant Road properties, and it ultimately awarded Kazlauskas damages totaling $88,800 on those claims. Kazlauskas then elected specific performance of the contracts instead of the damages awarded by the jury, and the trial court entered a judgment reflecting that election. We reverse and remand that case with instructions to enter a judgment awarding damages in accordance with the jury's verdict.

A brief description of the jury's deliberations is required in order to provide context for our consideration of the parties' arguments. The jury concurrently deliberated on both cases, and the various claims were submitted to the jury on a single verdict form. Initially, the jury returned a verdict indicating that, on the Victory Lane claim, Kazlauskas's damages were $258,500; that, on the Flax Plant Road claim, Kazlauskas's damages were $266,700; and that, on the Stickney Road claim in the other case, Emmert's total damages were $525,200. In short, the jury found that both parties were entitled to recover exactly the same amount of disputed

---

[1] Because both cases have been appealed, we refer to the parties simply by name rather than as plaintiff or defendant.

damages from each other on their various claims. After the jury returned its initial verdict, Kazlauskas pointed out to the court that, with respect to the Stickney Road claim, Emmert had only pleaded entitlement to $88,800 in damages in addition to the $20,000 that Kazlauskas conceded was owed. As described in more detail below, the trial court thereafter instructed the jury to deliberate further. The jury eventually returned a verdict finding that, on the Victory Lane claim, Kazlauskas's damages were $54,400, on the Flax Plant Road claim, Kazlauskas's damages were $54,400, and on the Stickney Road claim, Emmert's damages were $88,800, plus the $20,000 that was concededly owed. In short, the jury once again determined that both parties were entitled to recover exactly the same amount of damages from each other on their countervailing claims.

After the jury returned that verdict, Kazlauskas, who had sought damages and specific performance as alternative remedies, elected specific performance in lieu of the jury's award of damages. As a result of that election, the trial court entered a judgment requiring Emmert to pay Kazlauskas 20 percent of the profits from any future sale of the Victory Lane property and 30 percent of the profits from any future sale of the Flax Plant Road property.

Emmert appeals, raising numerous challenges that we address below. Kazlauskas cross-appeals, assigning error to various evidentiary rulings and other rulings that the trial court made with respect to the jury's deliberations. We reject Kazlauskas's evidentiary challenges without discussion. We turn briefly to his cross-appeal concerning the jury's deliberations, which we also conclude must fail. On Emmert's appeal, we conclude that the trial court properly denied Emmert's motion for a directed verdict but erred in awarding specific performance.[2]

On cross-appeal, Kazlauskas frames his assignment of error as follows: "The trial court erred in denying Kazlauskas' motion to accept the initial jury verdict of $258,500 for breach of the Victory Lane Farms profit sharing

---

[2] Emmert also raises several other assignments of error, which we reject without discussion.

agreement and of $266,700 for the Flax Plant Road profit sharing agreement." In support of that assignment of error, Kazlauskas asserts:

> "The verdict in [the Stickney Road case] could have been accepted, but reduced to the maximum amount of $88,800 (plus $20,000), or the jury could have been told to reconsider the verdict in that case only. But it was error to tell the jury to reconsider the verdict in this case."

Kazlauskas urges this court to reinstate the jury's initial damage awards on the Victory Lane and Flax Plant Road claims, at which point, he says, "he will elect that remedy." We understand that statement to purport to rescind his election of specific performance before the trial court on the ground that, in such circumstances, the reinstated damages award would constitute an adequate legal remedy.

We express no opinion regarding Kazlauskas's election of remedies argument, because we reject his assignment of error on a more fundamental ground. Kazlauskas not only failed to preserve the argument that he makes on appeal; he affirmatively waived that argument in the trial court. When the jury initially returned the verdict that awarded too much on the Stickney Road claim, Emmert's counsel suggested that the jury be asked to "revisit the whole verdict form." Kazlauskas's counsel stated that "I don't think it would be appropriate to tell them to go back and review other matters" and urged the court simply to "say to them that the maximum amount of [the Stickney Road claim] is $88,800, and ask them to go back and make corrections to the verdict." Kazlauskas also proposed that "one of the alternatives, Your Honor, is for us to ask you to receive the verdict and reduce the damages [on the Stickney Road claim] to $88,800." The court then suggested that it might instruct the jury about the maximum damages on the Stickney Road claim and also tell the jury that it could make changes on other portions of the jury form. In response to the court's suggestion, Kazlauskas's counsel stated:

> "I don't think you can comment about the other portions of the verdict, Your Honor. There's nothing wrong with them, and it's just not for us to do that. *They may wish to do it on their own, and we're not telling them to do it or not do*

*it.* But to comment on it is just absolutely inappropriate, I think, Your Honor."

(Emphasis added.) The court ultimately *agreed* with Kazlauskas's counsel on that point, stating: "I don't tell them that they are confined to [the Stickney Road claim] or they are not confined to [the Stickney Road claim], they can then take it from there."

To recap, before the trial court, Kazlauskas took the position that the court had two viable alternatives: (1) accept the verdict and have the court itself reduce the damages on the Stickney Road claim,[3] or (2) allow the jury to further deliberate on all of the claims but not specifically instruct them about anything other than the deficiency as to the Stickney Road claim. The court *adopted* the second of those alternatives. Because Kazlauskas encouraged the trial court to do what it did, and he did *not* ask the court to do what he now suggests would have been proper—that is, accept the verdict as to the Victory Lane and Flax Plant Road claims and instruct the jury that it was only to deliberate on the Stickney Road claim—he is in no position to argue on appeal that the court erred in making the decision that it made. We reject Kazlauskas's cross-appeal without further discussion.

We turn to Emmert's appeal. Emmert first asserts that the trial court erred in denying his motion for a directed verdict. In reviewing the denial of a motion for a directed verdict, we view the evidence, including reasonable attendant inferences, in the light most favorable to the nonmoving party. *Hudjohn v. S&G Machinery Co.*, 200 Or App 340, 342, 114 P3d 1141 (2005). Emmert asserts that Kazlauskas's contractual claim fails as a matter of law and that the court should have directed a verdict on it, because Kazlauskas failed to adduce sufficient proof of the existence of an enforceable contract as to either the Victory Lane property or the

---

[3] Kazlauskas asserts in passing that the trial court could have done that, but he makes no legal argument in support of that assertion. As Emmert correctly points out, under ORCP 59 G(4), an insufficient verdict "may be corrected by the jury under the advice of the court, or the jury may be required to deliberate further." "There is no provision, however, for the *court* to correct a verdict." *Badger v. Paulson Inv. Co.*, 98 Or App 200, 207, 779 P2d 1046, *modified in part on other grounds*, 100 Or App 12, 784 P2d 125 (1989), *rev'd in part on other grounds*, 311 Or 14, 803 P2d 1189 (1989) (emphasis in original).

Flax Plant Road property. A description of the parties' various business transactions is necessary to provide context for our consideration of the parties' arguments.

We begin with the transaction concerning the Victory Lane property. Emmert speculates in real estate in addition to engaging in other types of business. Kazlauskas also speculates in real estate by purchasing properties, rehabilitating them, and then selling them for a profit. Kazlauskas owned Victory Lane, a horse-boarding facility with acreage. He lived in a house on the property and managed the business. In August 2003, Victory Lane was in danger of foreclosure, and Kazlauskas approached Emmert about purchasing Victory Lane. The parties executed a statutory warranty deed that conveyed Victory Lane from a corporation controlled by Kazlauskas to Emmert. The deed recited that "[t]he true consideration for this conveyance is $1,200,000."

In his claim for breach of contract concerning Victory Lane, Kazlauskas alleged that, in addition to paying the $1,200,000 purchase price, Emmert also agreed that:

"1.   [Kazlauskas] would continue to reside in the main residence on said real property until the property could be subdivided;

"2.   [Kazlauskas] would operate through Victory Lane Farms, Inc. and then Victory Lane Farms Stable and Arena, and pay to [Emmert] the positive cash flow, if any;

"3.   When the property was subdivided, [Kazlauskas] would be deeded the main residence and the existing cow barn; and

"4.   [Kazlauskas] would receive a 20% interest in the profit from the sale of the subdivided property, *i.e.*, after [Emmert] was repaid the purchase price."

Kazlauskas testified at trial that he and Emmert had reached an oral agreement concerning various aspects of their transaction with respect to Victory Lane. They met in August 2003, and, according to Kazlauskas, Emmert agreed that, in addition to the purchase price, Kazlauskas "could have 20 percent of the upside," and that Kazlauskas "would continue running the farm as it had been running." When asked about the terms for managing the property,

Kazlauskas testified that "I don't believe it was clarified that particular moment, other than we would run it continually, get the house to stay in and live in, which was part of the transaction of the 20 percent for running the farm." Also present at the meeting were Kazlauskas's girlfriend, Abernathy, and Emmert's business associate, Schulze. According to Schulze, the parties discussed Kazlauskas's "sharing on the upside of the transition," and Emmert agreed that Kazlauskas and Abernathy "were going to live in the house, manage the farm, and when the property was subdivided, get the house and some of the property." According to Abernathy, based on that discussion, she and Kazlauskas would continue to live on the property and run the business, Kazlauskas would receive a percentage (30 percent) of the profits when the property was sold, and she and Kazlauskas would retain ownership of the house and barn after the sale.

In contrast, Emmert testified that he did not agree either to share 20 percent of "the upside" of Victory Lane with Kazlauskas or that Kazlauskas would receive the house and barn when the property was sold. Emmert remonstrated that the parties agreed that Kazlauskas and Abernathy would continue to live in the house and manage the property "in exchange for 70 percent of the gross," with Emmert to receive 30 percent.

On September 30, 2003, Kazlauskas sent a letter to Emmert stating, in part:

"I propose that the first two thousand of net profits each month be dispersed to me as salary for my work keeping the properties at Victory Lane Farms in good condition and in building the profitability for the stated property. Also, I propose that any proceeds over and above the two thousand net gain be split with Emmert International and myself on a 60/40 basis in our business venture.

"Looking into the future, I feel it good business to set up a plan for the real property involved in our joint venture. My thought was that in the event of sale or development of said property that my proceeds will be twenty percent of the net after any and all improvements are deducted as well as the current appraised value of 1.6 million, which would be due to Emmert International for their initial and continuing investment.

"Thirdly, I would like to have an article drawn to protect both parties in the untimely event of death or incompetence due to unforeseen mishap. This document shall clearly spell out our percentages of participation as to make clear to any party acting on either of our behalves.

"Also, I would like to have a clause stating if, in ten years time, the properties have not sold or been developed that either party may elect to be opted out of said venture and cashed out their percentage of fair market value minus any improvements put forth by the remaining party."

In February 2004, Kazlauskas again wrote to Emmert, stating that "there is a contract/document still needed on the 70/30 split for [Victory Lane] that we had verbal agreed upon. A contract that might make a better comfort zone for both of us, about the transactions we recently have made and for any future arrangements as well."

After the property was conveyed to Emmert, Kazlauskas continued to remodel the house at Victory Lane. By mid-2004 and beyond, the business at Victory Lane was foundering. Abernathy, who kept the books, indicated that she was not making regular payments to Emmert; instead, she paid him whatever they could spare. After receiving complaints from Victory Lane customers, Emmert replaced Kazlauskas as manager, and the present litigation ensued.

We now turn to the transaction concerning the Flax Plant Road property. When the parties met in August 2003, Kazlauskas told Emmert about the Flax Plant Road property. Kazlauskas had acquired an option to purchase that property but had failed to exercise the option before it expired. On December 15, 2003, Kazlauskas drafted and signed an agreement that provided:

"This is a document in regards to the property at 1085 Flax Platt [sic] road in Cornelius, Oregon. This property [sic] is between Outback Properties LLC (Terry Emmert) and D.Z. Investment Group LLC (Don Kazlauskas). These two companies will work to develop said named property and in turn split profit. Profits are divided as follows: 70% of profits to go to Outback Properties LLC and 30% of profits to go to D. Z. Investment Group LLC."

Kazlauskas testified that Emmert orally agreed to those terms but did not sign the agreement. The parties further agreed that Kazlauskas would manage the Flax Plant Road property in the same manner as Victory Lane.

On February 12, 2004, Emmert's office faxed the following document to Kazlauskas:

"ASSIGNMENT, ASSUMPTION, AND CONSENT TO THE ASSIGNMENT AND ASSUMPTION OF REAL ESTATE AGREEMENT

"For value received, the undersigned DZ Investment Group LLC, as Purchaser under that certain Earnest Money Agreement dated April 24, 2003, with [the Flax Plant Road sellers], for the purchase and sale of 1085 S. Flax Plant Road, Cornelius, Oregon 97113, attached hereto as Exhibit A, hereby assign all of its right, title and interest to Terry W. Emmert."

Kazlauskas signed that portion of the agreement. Emmert signed a portion whereby he assumed the agreement, and the seller signed a portion whereby he consented to the assignment of the agreement. Kazlauskas testified that, during a conference call before the deal was finalized, Emmert orally agreed "on a 70/30 split." Emmert, however, testified that he agreed to a 70/30 split of "the upside" if Kazlauskas found a "legitimate buyer" for the Flax Plant Road property. Shortly after the foregoing document was executed, Emmert purchased the Flax Plant Road property.

In support of his motion for a directed verdict, Emmert argued that, because the alleged agreements involved interests in real property, they were subject to the statute of frauds,[4] and the claims must fail because the

---

[4] ORS 93.020(1) provides, in part:

"No estate or interest in real property, other than a lease for term not exceeding one year, nor any trust or power concerning such property, can be created, transferred or declared otherwise than by operation of law or by a conveyance or other instrument in writing, subscribed by the party creating, transferring or declaring it, or by the lawful agent of the party under written authority, and executed with such formalities as are required by law."

ORS 41.580 provides:

"(1) In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and

alleged agreements were not in writing. He further asserted that, under the doctrine of "part performance," which may take an agreement outside of the statute of frauds, there must be an oral agreement that has been partially performed by the party seeking to enforce it, and that agreement must be "clear, certain, and unambiguous" in its terms. *Rafferty & Towner, Inc. v. NJS Enterprises, LLC*, 224 Or App 51, 55, 197 P3d 55 (2008), *rev den*, 347 Or 42 (2009). Emmert argued that the alleged agreements did not meet that standard. Furthermore, Emmert asserted, any qualifying "part performance" must be clearly referable to the contract, and Kazlauskas's conduct did not meet that standard. The trial court denied the motion for a directed verdict, concluding that Kazlauskas's part performance of the agreements took them outside of the statute of frauds.[5]

As we stated in *Brice v. Hrdlicka*, 227 Or App 460, 465-66, 206 P3d 265 (2009):

"Oregon's statute of frauds requires that certain types of agreements, including those 'for the sale of real property, or any interest therein,' must be in writing, unless an exception applies. The doctrine of part performance is one such exception. *Luckey et ux v. Deatsman*, 217 Or 628, 633, 343

---

subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"* * * * *

"(e) An agreement * * * for the sale of real property, or of any interest therein."

[5] In the first instance on appeal, Kazlauskas argues that the subject agreements were "to form a partnership to speculate in real estate" and, as such, were not subject to the statute of frauds under the rationale of *Terry v. Simmons*, 261 Or 626, 496 P2d 11 (1972). This case, however, is materially distinguishable from *Terry*. There, the parties had a longstanding partnership pursuant to which they bought numerous properties in the name of the partnership. *Id.* at 628-29. The parties had orally agreed that they would buy another property for the partnership, but ultimately, the defendant bought the property in his own name. *Id.* at 630. The defendant did not deny that the property was purchased on behalf of the partnership but, rather, asserted that the plaintiff was not entitled to a share of it because the plaintiff had not paid a portion of the down payment. *Id.* The court held that the oral agreement between the partners concerning the acquisition of that parcel was not subject to the statute of frauds. Suffice it to say that, in this case, Kazlauskas neither pleaded nor proved the existence of a partnership, much less did he allege the breach of a partnership agreement. At this stage, he may not alter his entire theory of the case.

> P2d 723 (1959). Under that doctrine, a court may enforce an agreement that would otherwise violate the statute of frauds if three requirements are met. First, the party asserting part performance must provide preponderating evidence of an agreement that is 'clear, certain and unambiguous in its terms.' *Young v. Neill et al.*, 190 Or 161, 166, 220 P2d 89 (1950). Second, there must be evidence of conduct 'unequivocally and exclusively referable to the contract.' *Strong v. Hall*, 253 Or 61, 70, 453 P2d 425 (1969). Finally, there must be equitable grounds for enforcing the agreement, such as facts justifying the avoidance of unjust enrichment or relief from fraud. *Luckey*, 217 Or at 633."

(Footnote omitted.)

We first consider whether the agreements at issue were sufficiently clear and unambiguous. Again, we view the evidence in the light most favorable to the prevailing party, Kazlauskas. Emmert first argues that the parties' references to "the upside" with respect to both deals rendered the agreements ambiguous, because that term is not defined. We disagree. It is clear on this record that the parties used the terms "upside" and "profits" interchangeably. Emmert next argues that "profits" also is ambiguous. Again, we disagree. As a general matter, when a party seeks damages for lost profits on a contract claim, those profits are net profits. *See generally GPL Treatment Ltd. v. Louisiana-Pacific Corp.*, 133 Or App 633, 637, 894 P2d 470 (1995), *aff'd*, 323 Or 116, 914 P2d 682 (1996) ("To recover for lost profits, a plaintiff must establish with reasonable certainty both the existence and amount of lost profits. * * * Only net lost profits may be recovered.").

Emmert next argues that the Victory Lane agreement was not sufficiently clear because the evidence concerning the percentage of profits to which Kazlauskas was entitled was in conflict. With respect to Victory Lane, Kazlauskas pleaded that the agreement was for 20 percent of the profits, but Abernathy testified that the agreed percentage was 30 percent. Moreover, the letter that Kazlauskas sent to Emmert in September 2003 referred to 20 percent, and the letter that Kazlauskas sent to Emmert in February 2004 referred to 30 percent. It is true that the evidence was in conflict in that regard. However, in assessing whether a directed

verdict should have been granted, we do not "weigh conflict-ing evidence or evaluate credibility." *Ballard v. City of Albany*, 221 Or App 630, 639, 191 P3d 679 (2008) (citations omitted). "A directed verdict is appropriate only if there is a complete absence of proof on an essential issue or when there is no conflict in the evidence and it is susceptible of only one construction." *Malensky v. Mobay Chemical Corp.*, 104 Or App 165, 170, 799 P2d 683 (1990), *rev den*, 311 Or 187 (1991). Stated differently, the mere existence of contradictory evi-dence does not, as a matter of law, entitle a party to a directed verdict.

Finally, Emmert argues that Kazlauskas's asserted "part performance" of both contracts was not unequivocally referable to the contracts. We agree that the evidence that Kazlauskas managed the properties was not specifically ref-erable to the asserted contracts, because he was receiving income in return for those services. In addition, Kazlauskas's residence in the house on Victory Lane was not necessarily referable to the alleged deal that would have given him an interest in the property; he already was living there before the transaction was consummated, and his residence also arguably was referable to his agreement to manage the business on the premises. Emmert acknowledges that Kazlauskas did continue remodeling the house to a minor extent, but, citing *Brice*, 227 Or App at 467, Emmert argues that making improvements to one portion of a property was not unequivocally referable to an agreement concerning another portion of the property. We conclude that Emmert's reliance on *Brice* is misplaced. In that case, the parties had made "an informal subdivision" of a parcel into two 20-acre lots, but the defendant's improvements were made only to his 20-acre portion. *Id.* at 464. Here, by contrast, Victory Lane was a single piece of property. Evidence was adduced that Kazlauskas did remodeling work on the house located there after the agreement at issue was made. That was sufficient evidence of part performance to defeat Emmert's motion for a directed verdict based on the statute of frauds.

With respect to the Flax Plant Road property, Emmert asserts that, because Kazlauskas made no improve-ments to that property, and his remodeling at Victory Lane was not referable to it, Kazlauskas failed to demonstrate any

part performance. We disagree. There was evidence not only that Kazlauskas managed the Flax Plant Road property for Emmert after the purchase, but there also was evidence that he facilitated that purchase by assigning whatever interest he had in the property to Emmert.[6] That evidence was sufficient to survive Emmert's motion for a directed verdict based on the statute of frauds.

Finally, we turn to Emmert's argument that the trial court erred in allowing Kazlauskas to elect a remedy of specific enforcement of the agreements rather than the jury's damage verdicts on the claims. Because specific performance is an equitable remedy, our review under ORS 19.415(3) (2007) is *de novo*. However, because our disposition of this assignment of error rests purely on a legal analysis, we need not and do not reassess all of the evidence *de novo*.

Kazlauskas is correct that, at least in the abstract, a party is entitled to elect from among different remedies for a breach of contract. *See, e.g.*, *Restatement (Second) of Contracts* § 378 (1979) (so noting). Thus, a plaintiff may, in theory, plead a breach of contract and alternatively seek the legal remedy of damages or the equitable remedy of specific performance. If, however, "adequate relief may be obtained in law, then equitable jurisdiction will not be invoked." *Thompson v. Coughlin*, 329 Or 630, 638, 997 P2d 191 (2000). As the court held in *Eckles v. State of Oregon*, 306 Or 380, 401, 760 P2d 846 (1988), "[s]pecific performance is available only if other remedies are deemed to be inadequate to protect the nonbreaching party's contractual interests. *Cf. Restatement (Second) Contracts* §§ 359-60 (1979)." A damages remedy at law "must be practical, efficient, and adequate, as full a remedy as that which can be obtained in equity." *Alsea Veneer, Inc. v. State of Oregon*, 318 Or 33, 44, 862 P2d 95 (1993).

Emmert asserts that Kazlauskas had an adequate remedy at law in the form of damages. Indeed, as noted,

---

[6] As noted, when Emmert purchased the property, Kazlauskas's option to purchase the property had expired. However, because Emmert and the seller made the transaction contingent on Kazlauskas assigning his interest to Emmert, and the seller, in essence, honored the option agreement, it is apparent that the option was not entirely without value to the parties.

Kazlauskas tried his claim for damages to the jury, which awarded damages—albeit not in as great an amount as he sought. Moreover, as noted, in his cross-appeal concerning the jury's deliberations, Kazlauskas asserts that, if we were to reinstate the jury's initial verdict for a greater amount of damages than it ultimately awarded, he would elect that damages remedy rather than specific performance. Thus, Kazlauskas's position in this litigation is not that monetary damages for the breaches were inadequate *as a matter of law*, but that the monetary damages that the jury actually awarded were inadequate *as a matter of fact*. We disagree with Kazlauskas's proposition that equitable relief is available under such circumstances.

*Moore v. Fritsche et al.*, 213 Or 103, 112-13, 322 P2d 114 (1958), sets out the controlling legal principles:

> "Specific performance is not granted as a matter of right; its granting must rest solely in judicial discretion, controlled by equitable principles. *Perez v. Potier*, 179 Or 123, 170 P2d 343 [1946)]; *Harris v. Craven*, 162 Or 1, 91 P2d 302 [(1939)].

> "Since the oral agreement to will property is in conflict with the provisions of the statute of frauds, 'It is only in cases where the services performed are of an unusual character, involving elements other than the actual work itself, and where compensation in money would not be adequate, that specific performance of such an oral agreement will be decreed.' *Roadman v. Harding*, 63 Or 122, 125, 126 P 993 [(1912)] * * *.

> "[I]t is established law that one who has performed services under such an agreement can generally be adequately compensated in an action at law, and it is only in those cases where the services performed are of such an unusual character that there is no monetary standard by which they can be valued, or those where the party complaining has so irretrievably changed positions, by reason of the agreement, to his disadvantage that to permit the other to refuse performance would accomplish a fraud, that specific performance is granted."

(Some citations omitted.) Here, Kazlauskas's performance of the agreements involved, for the most part, his management of the properties at issue and, at least with respect to Victory Lane, he received some income for doing so. In addition, he

did a small amount of remodeling work on the house at Victory Lane and, with respect to the Flax Plant Road property, he assigned to Emmert whatever interest he had under an expired option agreement. Kazlauskas's contributions are not in any way "of such an unusual character that there is no monetary standard by which they can be valued." *Id.* at 113.

Kazlauskas nonetheless asserts that monetary damages were inadequate because the future profits from the sale of Victory Lane and Flax Plant Road "cannot be ascertained." That argument is both legally and factually unavailing on this record. At trial, Kazlauskas presented expert testimony from a real estate appraiser who testified as to the value of Victory Lane in light of its prospects for future development. The appraiser concluded that, within the next seven to 10 years, the property was likely to be brought within the urban growth boundary. In light of its potential for future development, he valued the property at $2,520,000, which was approximately twice the amount that Emmert had paid Kazlauskas for it. Counsel for Kazlauskas argued to the jury:

> "And so the profit—right now, Mr. Emmert has a profit on this property of $1,282,500. That's the—if it were to be sold today, that's the amount of the upside, 20 percent of which is $258,500."

With respect to the Flax Plant Road property, Kazlauskas relied on Emmert's current financial statement as evidence of its value. In closing, he argued to the jury:

> "The current value is a million eight. The purchase price from the Carters was $451,000. [A local improvement district assessment is] $460,000. So the profit today is $889,000, 30 percent of which is $226,700. That's what the profit is."

In sum, Kazlauskas presented evidence of a precise amount of lost profits damages, and he asked the jury to award that amount. Moreover, as noted, *see* 248 Or App at 559-60, he asserts on appeal that, if we were to direct the trial court on cross-appeal to reinstate the jury's initial verdict for $258,500 on the Victory Lane claim and $266,700 on the Flax Plant Road claim, he would abandon his election of specific performance and, instead, elect his damages remedy. Thus,

Kazlauskas provided the jury with a precise amount of damages to which he sought entitlement, and he adduced particularized evidence in support of that amount. In addition, he has made it clear that a jury verdict in that amount would, in fact, adequately compensate him for the breaches. In such circumstances, specific performance was not an appropriate remedy. Kazlauskas's remedy at law was "practical, efficient, and adequate." *Alsea Veneer*, 318 Or at 44.

We reject the parties remaining arguments without discussion.

In case CV06090108, affirmed; in case CV07020311, reversed and remanded with instructions to enter a judgment awarding damages in accordance with the jury's verdict.