Argued and submitted March 1, reversed and remanded on appeal and on cross-appeal December 27, 2012, petition for review allowed May 31, 2013
(353 Or 714)

EVERGREEN WEST BUSINESS CENTER, LLC,
an Oregon limited liability company,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

Terry W. EMMERT,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

PREMIER WEST BANK,
*Impartial.*

Clackamas County Circuit Court
CV07020348; A146301

296 P3d 545

Stuart M. Brown argued the cause for appellant - cross-respondent. With him on the briefs was Wiles Law Group.

John M. Berman argued the cause for respondent - cross-appellant. With him on the briefs was J. Rion Bourgeois.

Before Schuman, Presiding Judge, and Armstrong, Judge, and Wollheim, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant Terry Emmert was a member of plaintiff Evergreen West Business Center, LLC (Evergreen), a limited liability company formed to purchase and develop property located in Washington County. Evergreen purchased the property with a loan from West Coast Bank, but eventually fell behind on payments and was at risk of losing the property to foreclosure. According to Evergreen, Emmert agreed to work with West Coast Bank to postpone the foreclosure, but, rather than do as promised, Emmert instead purchased the note and trust deed to the property from West Coast Bank, allowed the foreclosure sale to proceed, and then purchased the property for himself at the trustee's sale—all without notifying any of Evergreen's other members.

Evergreen then brought this action alleging that Emmert had breached a fiduciary duty to Evergreen by secretly acquiring the property. The complaint sought damages or, alternatively, imposition of a constructive trust whereby the property would be sold and the proceeds distributed to Evergreen's creditors and its members; Evergreen later amended the complaint to request punitive damages.

A jury returned a verdict in Evergreen's favor, awarding nominal damages of $1 but punitive damages in the amount of $600,000. Neither side was satisfied with that verdict. Emmert asked the trial court to reduce the punitive damages award, arguing that the 600,000-to-1 ratio of punitive to compensatory damages violated his right to due process. Evergreen, for its part, asked the court to rule on the remedy of a constructive trust as an alternative to the jury's nominal damages award, but wanted to keep the punitive damages component.

The trial court ruled that, given the $1 economic damages award, a punitive damages award of $600,000 was grossly excessive, and, adhering to case law that suggested a 4-to-1 ratio as the outer limit permitted under the Due Process Clause, the court reduced the punitive damages award to $4. The court also ruled that Evergreen was entitled to the imposition of a constructive trust and allowed Evergreen to between the two remedies—a $5 verdict (the nominal award plus punitive damages) or imposition of a

constructive trust without any punitive damages. Evergreen chose the latter.

Emmert now appeals the ensuing judgment against him, arguing that he did not owe any fiduciary duty to Evergreen, did not breach any such duty, and was not unjustly enriched at Evergreen's expense. He also argues that the court erred in imposing a constructive trust remedy that would exceed the $1 jury award of economic damages, and in failing to credit him for his expenditures on the property after he acquired it. Evergreen cross-appeals, arguing that the court erred in reducing the punitive damages award and in concluding that punitive damages are not available in conjunction with an equitable remedy. For the reasons that follow, we reverse on appeal and on cross-appeal, and we remand for further proceedings.

## I. BACKGROUND

Unless otherwise noted, we state the facts in the light most favorable to Evergreen, the prevailing party at trial. *Liles v. Damon Corp.*, 345 Or 420, 423, 198 P3d 926 (2008). In 2001, Brad Taggart, John Hoffard, Carl Senour, and Emmert formed Evergreen, a manager-managed limited liability company. The company was formed to purchase a 4.57-acre parcel and develop that property as a small business park that would have Senour, a cabinet maker, as the anchor tenant. Evergreen purchased the property for $846,044, most of which ($552,500) was borrowed from West Coast Bank and secured by a trust deed.

While the property was being developed, the acquisition loan matured, and, in March 2004, West Coast Bank notified Evergreen that the bank intended to foreclose the trust deed on the property. Taggart, who was Evergreen's manager, sought a new loan in the amount of $3.4 million to pay off the acquisition loan and to fund construction on the property. That loan application was denied.

Taggart then approached Emmert about Evergreen's financial situation, and the two agreed to work on a two-step process to obtain financing. First, Evergreen would obtain a "bridge loan" of $900,000 to pay off West Coast Bank and a few other parties. Second, Evergreen would obtain separate construction financing. Emmert suggested

that Taggart contact Bob Dyer, a banker at Oregon Pacific Banking Company, with whom Emmert had done other business. Taggart did so, and Dyer told him that "a small loan" of $900,000 "wouldn't be a problem."

Dyer, though, was in the process of leaving Oregon Pacific Banking Company and preferred to take the loan application with him to his future employer, Premier West Bank. After Dyer joined Premier West Bank, he asked Taggart for a new appraisal of the property and an explanation of how the $900,000 in loan proceeds would be used.

In the meantime, West Coast Bank advised Taggart that the scheduled foreclosure sale was being postponed to September 15, 2004. Taggart assured a loan officer for West Coast Bank that the bridge loan from Premier would be approved and would allow Evergreen to pay off the promissory note, but West Coast Bank required "something in good faith"—namely, a $50,000 payment toward the loan—to further delay the foreclosure proceedings while the bridge financing was finalized.

Taggart then met with Emmert and explained West Coast Bank's demand for a $50,000 payment to postpone the foreclosure sale beyond September 15. At that point, Emmert told Taggart to "do nothing but focus on this [bridge] loan with Bob Dyer" at Premier West Bank and that Emmert himself "will take care of the West Coast Bank loan." From time to time after that discussion, Taggart asked Emmert about the West Coast Bank situation, and Emmert told Taggart "not to worry about it; that he [Emmert] was taking care of it and he had everything under control[.]"

Emmert, it turned out, was negotiating with West Coast Bank—but not for the benefit of Taggart or Evergreen. Rather, beginning in early September 2004, Emmert began negotiating to purchase the promissory note and related trust deed from West Coast Bank. On September 15, Emmert paid $50,000 to West Coast Bank to postpone the foreclosure sale. From that point, West Coast Bank sent letters only to Emmert; it did not copy Taggart on a letter stating that the foreclosure was rescheduled to October 15, 2004.

Despite status inquiries from Taggart, Emmert never disclosed that he was in the process of purchasing the underlying promissory note and trust deed to Evergreen's property. Rather, Emmert allowed Taggart to continue working with Dyer to obtain a $900,000 loan for Evergreen. On September 22, 2004, in response to Dyer's earlier request for an explanation of how those loan proceeds would be used, Taggart drafted an explanation and sent it to Emmert for his approval. Emmert approved the draft, and Taggart sent the explanation to Dyer on September 27, 2004. Dyer then told Taggart that he was leaving on a hunting trip and would process the loan application when he returned.

Emmert, though, told Dyer not to proceed with that bridge loan to Evergreen because Emmert had "worked something out" with the noteholder, West Coast Bank. And Emmert had worked something out: the purchase of the note. On October 14, 2004, the day before the scheduled foreclosure sale, Emmert purchased the note and trust deed from West Coast Bank for $563,979.49. Emmert signed the assignment of the note and trust deed on October 21, 2004. The following day, Emmert's attorney, as trustee, held a foreclosure sale. Emmert bid on and obtained the property himself, at a total investment of $613,979.49. An appraisal obtained for the Premier West Bank loan, and dated one month earlier, had valued the property at $1,390,000. After purchasing the property for himself, Emmert then used the property as security to obtain, in his own name, the $900,000 loan from Premier West Bank to develop the property.

Evergreen subsequently filed this action for breach of fiduciary duty. Evergreen alleged, among other contentions, that Emmert "agreed to provide financial assistance to [Evergreen] in order to avoid the pending foreclosure and to obtain said development loan * * *[,]" and that, instead of doing so, Emmert "purchased the lender's note and trust deed from the lender and then foreclosed on said real property and took ownership of it for his own account, all without notifying [Evergreen] or the other members that he was doing or had done so." Evergreen sought alternative remedies: On the one hand, Evergreen alleged that Emmert "obtained title to said real property by fraud and breach of his fiduciary duty" and asked the court

to "declare that Defendant Emmert holds title to said real property in trust for Plaintiff and said members" and "said real property [be] sold for the benefit of [Evergreen], and the proceeds distributed first to creditors and then to members as their interests may appear." Alternatively, Evergreen alleged that it was "damaged in a sum to be determined at trial, but not less than $800,000." Later, Evergreen was allowed to amend the complaint to add a claim for punitive damages.

The breach of fiduciary duty claim was tried to a jury. As to the of the claim, the jury was instructed as follows:

"To recover for breach of fiduciary duty, the plaintiff must prove, one, the existence of a fiduciary relationship between the parties; two, a breach of one or more of the fiduciary duties arising out of that relationship; and three, damage to the plaintiff resulting from a breach of one or more of those duties."

The jury was further instructed that, under Oregon law, "A member of a limited liability company who is not also a manager, owes no duties to the limited liability company or other members solely by reason of being a member." In the event of a breach of fiduciary duty, the jury was told, "then the non-breaching party is entitled to any profits made by the breaching party as a result of the breach."

The jury returned a verdict in which it found that Emmert had breached a fiduciary duty to Evergreen. As for damages, the jury awarded Evergreen $1 in economic damages and $600,000 in punitive damages. At that point, Emmert filed a motion for judgment notwithstanding the verdict (JNOV) and a motion to reduce the punitive damages award. In his JNOV motion, Emmert argued that, as a member of Evergreen, he owed no duty to Evergreen or its other members under ORS 63.155(9), which provides that, for manager-managed LLCs like Evergreen, "[a] member who is not also a manager owes no duties to the limited liability company or the other members solely by reason of being a member[.]" In his motion regarding punitive damages, Emmert argued that the $600,000 award was grossly excessive in light of the nominal damages awarded; he asked

the court to "either grant a JNOV with regard to punitive damages, or reduce the punitive damages award to $4."

In response to those motions, Evergreen defended the jury's determinations regarding the breach of fiduciary duty and the punitive damages award, but it also asked the court to impose a constructive trust as an alternative to the jury's damages award. Evergreen argued that "the measure of damage is the profit available to Defendant Emmert" but that "the jury concluded that Defendant Emmert has not yet received any profit. The jury recognized in accordance with the evidence, that at any time Defendant Emmert can obtain profit, but apparently they concluded that they could not tell how much he would receive." Thus, Evergreen argued, the property should be subject to a constructive trust and sold such that Emmert "will be entitled to the $613,979.49 that he paid for the note and trust deed, and Plaintiff will be entitled to the balance of the proceeds."

After a hearing on the various motions, the trial court reduced the punitive damages award from $600,000 to $4, concluding that anything greater than an award of four times the $1 economic damages award would violate due process. *See Goddard v. Farmers Ins. Co.*, 344 Or 232, 259-61, 179 P3d 645 (2008) (explaining that punitive damage awards in cases of purely economic injury should generally be limited to a 4-to-1 ratio). The court also concluded that imposition of a constructive trust was available to Evergreen as an alternative remedy, but that the equitable relief could not be joined with a punitive damages award. Faced with the choice between a $5 award and the imposition of a constructive trust, Evergreen the latter remedy. The court then entered a judgment "that Plaintiff Evergreen West Business Center, LLC is granted a constructive trust of the Property" and that the "Property shall be sold by [Evergreen]. From the proceeds [Evergreen] shall repay to [Emmert] the first $613,979.49. [Emmert] shall be responsible for paying any obligations for which [Emmert] has pledged the Property. To the extent [Emmert] does not do so, and proceeds from the sale of the Property are used to pay [Emmert's] debt in excess of $613,979.49, [Evergreen] shall be entitled to a supplemental judgment for any such sums." Emmert appeals that judgment, and Evergreen cross-appeals.

## II. ANALYSIS

A. *Emmert's Appeal*

We begin by addressing Emmert's first and second assignments of error on appeal because our resolution of those assignments obviates the need to address many of the remaining issues in the case. Emmert's first two assignments of error concern the trial court's imposition of a constructive trust.

Although Evergreen pleaded a claim for "constructive trust," "the concept of constructive trust does not stand on its own as a substantive claim, but exists solely as an equitable remedy, available to divest an individual who has been unjustly enriched of property that he or she ought not, in equity and good conscience, hold and enjoy." *Tupper v. Roan*, 349 Or 211, 219, 243 P3d 50 (2010) (internal quotation marks and emphasis omitted). For that reason, the "concepts of constructive trust and unjust enrichment thus are intertwined: When 'the law employs a constructive trust, the doctrine of unjust enrichment governs generally the substantive rights of the parties.'" *Id.* (quoting *Barnes v. Eastern and Western Lbr. Co.*, 205 Or 553, 597, 287 P2d 929 (1955)).

Oregon cases do not "provide any really comprehensive exposition of that doctrine" but instead "simply describe the kinds of actions and circumstances that would constitute unjust enrichment warranting imposition of a constructive trust, and then observe that the concept extends to other similar acts and circumstances." *Id.* at 220. For purposes of this case, suffice it to say that those circumstances include "when a person in a fiduciary or confidential relationship acquires or retains property in violation of a duty impressed upon him by that relationship." *Id.* (citing *Albino v. Albino*, 279 Or 537, 550, 568 P2d 1344 (1977)). The remedy is limited to those circumstances in which there is no other remedy available. *See Belton v. Buesing*, 240 Or 399, 409, 402 P2d 98 (1965) (constructive trust is a "remedial institution invented by equity to avoid unjust enrichment in situations where there is no other available equitable remedy"); *Brown v. Brown*, 206 Or App 239, 251, 136 P3d 745, *rev den*, 341 Or 449 (2006) ("Oregon courts impose constructive trusts as remedial devices to avoid unjust enrichment when no other adequate remedy

is available."); *see generally Alsea Veneer, Inc. v. State of Oregon*, 318 Or 33, 43, 862 P2d 95 (1993) ("Equitable relief does not lie if there is an adequate remedy at law"; "remedy at law must be practical, efficient, and adequate, as full a remedy as that which can be obtained in equity.").

 With those precepts in mind, we turn to the trial court's imposition of a constructive trust. Emmert's first two assignments of error advance three reasons why the court erred in imposing that equitable remedy: (1) Emmert did not owe any fiduciary duty to Evergreen; (2) if he did owe a duty, he did not breach it; and (3) the jury determined his "unjust benefit" to be nominal and, for that reason, "the constructive trust should either not have been imposed (because the legal remedy of damages would be adequate as a matter of law) or limited to payment of $1 from the sale of the Property."

 The first two of those arguments merit little discussion. Emmert's concept of fiduciary duties is premised on a misreading of ORS 63.155, a statute concerning fiduciary duties for members and managers of limited liability companies. Section 9 of that statute provides:

 "In a manager-managed limited liability company:

 "(a)  A member who is not also a manager owes no duties to the limited liability company or the other members solely by reason of being a member;

 "(b)  A manager is held to the same standards of conduct prescribed for members in subsections (2) to (8) of this section;

 "(c)  A member who, pursuant to an operating agreement, exercises some or all of the rights of a manager in the management and conduct of the limited liability company's business is held to the standards of conduct described in subsections (2) to (8) of this section to the extent that the member exercises the managerial authority vested in a manager by this chapter; and

 "(d)  A manager is relieved of liability imposed by law for violation of the standards prescribed by this section to the extent, if any, of the managerial authority delegated to the members who are not also managers by an operating agreement."

According to Emmert, that statutory scheme should be construed so that "any fiduciary duty owed by one member to another (or to the company) is to be strictly limited to managerial duties imposed on that member by the Operating Agreement."

ORS 63.155(9), however, addresses an LLC member's fiduciary duties "*solely* by reason of being a member" and when a member, "pursuant to an operating agreement, exercises some or all of the rights of a manager in the management and conduct of the limited liability company's business * * *." (Emphasis added.) Contrary to Emmert's suggestion, the statute does not preclude a member from establishing a fiduciary relationship with anyone—including the LLC—in other ways. In this case, Evergreen's claim was not based on the fact that Emmert was a member of the LLC or that he was exercising rights pursuant to the LLC's operating agreement. Rather, it was based on the common-law theory that Emmert, by promising to handle the West Coast Bank loan on behalf of Evergreen, had entered into a relationship of confidence with the company that required him to act "in good faith and with due regard to the interests of the one reposing the confidence." *Starkweather v. Shaffer*, 262 Or 198, 205, 497 P2d 358 (1972). The jury instructions on fiduciary duties, as well as Evergreen's closing argument, the former of which is set out above, 254 Or App at 367, are explicit as to that theory. Nothing in ORS 63.155 prevents one member from assuming fiduciary duties by entering into a relationship of confidence with another.

Emmert's second argument—that even if he owed a fiduciary duty to Evergreen, he did not breach it—simply disregards the jury's findings. Emmert selectively identifies facts that are favorable to his case while ignoring the ample evidence that he secretly negotiated on his own behalf while purporting to act on behalf of Evergreen. The jury was entitled to—and did—reject Emmert's version of events. In short, there was sufficient evidence for the jury to conclude that Emmert had breached a fiduciary duty, and, consequently, for the trial court to conclude that he violated the type of a "duty imposed by a confidential or fiduciary relationship" that would support the imposition of a constructive trust. *See Albino*, 279 Or at 550 ("A constructive trust arises where

a person in a fiduciary or confidential relationship acquires or retains property in violation of his duty to the grantor.").

Emmert's remaining contentions focus on the effect of the jury's verdict in this case—specifically, the fact that the jury determined that he had profited only in a nominal amount. *See Frazee v. Brazda*, 239 Or 624, 627, 399 P2d 346 (1965) ("Nominal damages are usually defined as a trivial sum and are usually represented by a judgment for one dollar or a lesser sum."); *Hall v. Cornett Et al.*, 193 Or 634, 644, 240 P2d 231 (1952) ("Nominal damages means no damages at all." (Internal quotation marks and citations omitted.)). According to Emmert, the jury's verdict determined that the "unjust benefit" to Emmert was $1 and, for that reason, the court should not have imposed a constructive trust that would allow Evergreen to recover more than that amount.

Evergreen, for its part, argues that Emmert was unjustly enriched far more than the $1 jury verdict, because he "received property worth $1,390,000 by paying only $613,979.49 as a result of his breach of fiduciary duty." Moreover, Evergreen argues, real property is unique, and the constructive trust remedy and damages remedy serve different purposes: "The constructive trust is imposed to give [Evergreen] back its property, not so that [Evergreen] can obtain a dollar."

In the abstract, we agree with Evergreen's contention that damages might be an inadequate remedy where an agent's breach of fiduciary duty has divested his principal of real property. However, that is not true here, given how this case was tried to the jury. As set out above, Evergreen did not seek damages in the amount of its own loss from Emmert's actions; rather, Evergreen sought damages measured by Emmert's *gain*. The jury was instructed, at Evergreen's request, that "the non-breaching party is entitled to any profits made by the breaching party as a result of the breach." Evergreen offered evidence that the property was worth more than $1.3 million at the time of the foreclosure sale and that Emmert, by breaching his fiduciary duties to Evergreen, had obtained that property for approximately $600,000. During closing arguments, Evergreen's counsel emphasized that evidence and told

the jury that Emmert had therefore profited "overnight" more than $700,000. Evergreen asked the jury to award that amount—that is, the profit that Emmert obtained—to Evergreen.

For whatever reason, the jury returned an award of damages in the amount of $1. It was only after the jury awarded nominal damages on that claim that Evergreen requested that the court rule on its alternative request for a constructive trust. Given that posture, we agree with Emmert that the constructive trust imposed by the court was not a permissible equitable remedy.

Equitable remedies are not for the purpose of correcting disappointing jury verdicts or remedying a failure of proof. As we recently explained in *Kazlauskas v. Emmert*, 248 Or App 555, 275 P3d 171 (2012), there is a difference between a jury verdict that is inadequate as a matter of *law* and one that is inadequate as a matter of *fact*. In *Kazlauskas*, the defendant (the same Terry Emmert) argued that the trial court had erred in allowing the plaintiff, Kazlauskas, to a remedy of specific enforcement rather than the jury's damages verdicts on breach of contract claims. We agreed with Kazlauskas that, "at least in the abstract, a party is entitled to from among different remedies for a breach of contract." *Id.* at 569. We also explained, however, that if "'adequate relief may be obtained in law, then equitable jurisdiction will not be invoked.'" *Id.* (quoting *Thompson v. Coughlin*, 329 Or 630, 638, 997 P2d 191 (2000)). Thus, the question was whether Kazlauskas had an adequate remedy at law in the form of damages. We concluded that he did, notwithstanding the inadequacy of the actual award:

> "Kazlauskas tried his claim for damages to the jury, which awarded damages—albeit not in as great an amount as he sought. Moreover, as noted, in his cross-appeal concerning the jury's deliberations, Kazlauskas asserts that, if we were to reinstate the jury's initial verdict for a greater amount of damages than it ultimately awarded, he would that damages remedy rather than specific performance. Thus, Kazlauskas's position in this litigation *is not that monetary damages for the breaches were inadequate as a matter of law, but that the monetary damages that the jury actually awarded were inadequate as a matter of fact. We*

*disagree with Kazlauskas's proposition that equitable relief is available under such circumstances.*

"* * * * *

"Kazlauskas nonetheless asserts that monetary damages were inadequate because the future profits from the sale of Victory Lane and Flax Plant Road 'cannot be ascertained.' That argument is both legally and factually unavailing on this record. At trial, Kazlauskas presented expert testimony from a real estate appraiser who testified as to the value of Victory Lane in light of its prospects for future development. The appraiser concluded that, within the next seven to 10 years, the property was likely to be brought within the urban growth boundary. In light of its potential for future development, he valued the property at $2,520,000, which was approximately twice the amount that Emmert had paid Kazlauskas for it. Counsel for Kazlauskas argued to the jury:

"'And so the profit—right now, Mr. Emmert has a profit on this property of $1,282,500. That's the—if it were to be sold today, that's the amount of the upside, 20 percent of which is $258,500.'

"With respect to the Flax Plant Road property, Kazlauskas relied on Emmert's current financial statement as evidence of its value. In closing, he argued to the jury:

"'The current value is a million eight. The purchase price from the Carters was $451,000. [A local improvement district assessment is] $460,000. So the profit today is $889,000, 30 percent of which is $226,700. That's what the profit is.'

"In sum, Kazlauskas presented evidence of a precise amount of lost profits damages, and he asked the jury to award that amount. Moreover, as noted, *see* 248 Or App at 559-60, he asserts on appeal that, if we were to direct the trial court on cross-appeal to reinstate the jury's initial verdict for $258,500 on the Victory Lane claim and $266,700 on the Flax Plant Road claim, he would abandon his of specific performance and, instead, his damages remedy. Thus, Kazlauskas provided the jury with a precise amount of damages to which he sought entitlement, and he adduced particularized evidence in support of that amount. In addition, he has made it clear that a jury verdict in that amount would, in fact, adequately compensate him for the

breaches. In such circumstances, specific performance was not an appropriate remedy. Kazlauskas's remedy at law was 'practical, efficient, and adequate.' *Alsea Veneer*, 318 Or at 44."

248 Or App 555 (emphasis added).

Here, likewise, Evergreen has not seriously contended that Emmert was unjustly enriched in a way that could not have been valued for or compensated by a damages award in this case. Rather, the contention is that the jury, as a matter of *fact*, did not actually award damages in accordance with the evidence. Evergreen has offered various explanations for the jury's nominal award. In the trial court, Evergreen suggested that the jury was misled by closing arguments when Emmert's counsel stated (without objection from Evergreen) that the measure of damages was the value to Evergreen rather than the profit by Emmert. Evergreen also speculated that the jury simply was unwilling to award lost profits because it believed that, until the property was sold, Emmert had not profited. Similarly, Evergreen on appeal suggests that "the jury's determination of damages probably resulted from the improper admission of testimony as to [Emmert's] holding costs, because until [Emmert] sold or did something with the property, he had not yet earned a profit." However, those criticisms are directed toward the jury's deliberations and the proof adduced at trial, not the adequacy of a damages award as a matter of law.[1]

Under the circumstances—that is, where the jury is presented with evidence of a damages claim that would wholly compensate the nonbreaching party—the equitable remedy of a constructive trust is not available simply because the jury returns a lesser verdict than requested.[2]

---

[1] We appreciate that real property is unique, but Evergreen has never suggested that the property should have been conveyed back to it; from the beginning, Evergreen has asked that the property be sold for its benefit. We also appreciate that the valuation of the property has changed over time, but that alone does not render damages an inadequate remedy. *Cf. Kazlauskus*, 248 Or App at 571 (rejecting argument that future profits could not be ascertained and describing appraiser's testimony about future development).

[2] At a later hearing on the form of judgment, Emmert's counsel conceded that a constructive trust could be imposed to ensure payment of the $1, and Emmert argues on appeal that any constructive trust must be limited to an award of $1. The court's intent plainly was not to enter a constructive trust to ensure payment

## B.  *Evergreen's Cross-Appeal*

Evergreen's first two assignments of error on cross-appeal involve the subject of punitive damages; its third assignment concerns the admission of evidence regarding the costs Emmert incurred to hold and maintain the property after the foreclosure sale. We start with Evergreen's third assignment of error—the admission of purportedly inadmissible evidence—because reversal on that assignment would require a retrial, including on the issue of punitive damages.

In its third assignment of error, Evergreen contends that the "trial court erred in admitting testimony concerning [Emmert's] holding costs after he obtained title to the property." Specifically, Evergreen argues that the trial court allowed Emmert to testify that he had incurred substantial expenses holding the property after he acquired it, which, Evergreen believes, "influenced the jury to conclude that he did not have any profit to return to [Evergreen]." Thus, Evergreen requests that we remand the case "for trial solely as to the issue of damages."

Evergreen's third assignment of error, however, cannot clear the initial hurdle of preservation of error. The relevant exchange at trial was as follows:

"Q.  [EMMERT'S COUNSEL]  Looking at what's in front of you that's marked as Exhibit 163, can you identify that document, sir?

"A.  [EMMERT]  Well, sort of. It is a—an accounting of the checks that made—were made payable on my behalf to Evergreen West Business Center, plus the amount of the loan, plus the taxes and plus the—the—the interest on the loan to date.

"Q.  All right. And this would be the loan that was taken on the property after you bought it at the foreclosure sale?

_____

of a $1 nominal damages award, and we therefore simply reverse the judgment in that regard rather than modifying it to impose a $1 limit.

Moreover, because we are reversing the judgment imposing the constructive trust, we need not reach Emmert's third assignment of error, in which he argues that his costs in maintaining and keeping the property should have been reimbursed from any sale of the property.

"A. Yes, sir.

"Q. And what is that amount, sir?

"[EVERGREEN'S COUNSEL]: Objection; he's relying on a document that's not been introduced and would be subject to an objection of relevancy.

"THE COURT: He can—he can answer based on his own knowledge. If he needs the document to refresh his memory, he can do that."

At that point, Emmert testified, without further objection,

"As I said they brought it to me in pieces, so that I'm—I'm adding it up. And at the time, I'm rounding this one number off, but basically there was $761,010, including the contributions that—that I made to the Evergreen West, the $50,000 for West Coast Bank for Evergreen Business Park, the $50,000 and the $563,979.49. So that comes to a total of $761,010.

"There was a principal reduction of [$56,000] which is not counted, but the interest would be $388,240, and there were taxes and fees of $35,000 paid. And, of course, they do have legal expenses on it, but that was not added into the number."

As that colloquy demonstrates, Evergreen's objection was to Emmert's reliance *on a document* that, according to counsel, would have been subject to a relevancy objection, and that is how the court understood it. The court allowed Emmert to testify based on his own recollection and to refresh his recollection with the document. That objection did not alert the court in the slightest to the argument that Evergreen now makes on appeal—namely, that "[w]hen a party wrongfully takes property belonging to another, and incurs holding costs that do not result in any physical improvement to the property, that party has to pay his own self-inflicted costs, even including interest." We therefore decline to reach Evergreen's third assignment of error on cross-appeal.

Finally, we turn to Evergreen's arguments regarding punitive damages. In its first assignment of error, Evergreen argues that the court erred in ruling that "punitive damages are not legally available for [Evergreen's]

claim for a constructive trust." Given our conclusion that the constructive trust was erroneously imposed in this case, Evergreen's first assignment of error is moot.

The only remaining issue, then, is whether the trial court erred in reducing the jury's punitive damages award from $600,000 to $4. As noted above, the trial court reduced the jury's punitive damages award after applying the familiar guideposts for assessing the constitutionality of such awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Ins. Co. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003). The court's ruling turned on the second guidepost and, more directly, the Oregon Supreme Court's observation in *Goddard*, 344 Or at 275, that "when the conduct has solely economic effects and does not cause or risk physical harm to another, the ratio between the punitive damages award and compensatory damages normally cannot exceed four to one."

After the trial court's ruling in this case, the Oregon Supreme Court explained that there are circumstances—namely, "when the compensatory damages award is small and does not already serve an admonitory function"—in which the second guidepost and its ratio test are "of limited assistance in determining whether the amount of a jury's punitive damages award meets or exceeds state goals of deterrence and retribution." *Hamlin v. Hampton Lumber Mills, Inc.*, 349 Or 526, 536-37, 246 P3d 1121 (2011). In *Hamlin*, the jury had awarded $6,000 in lost wages and $175,000 in punitive damages to a plaintiff who alleged that his employer had refused to reinstate him after he suffered an injury at work, thereby violating ORS 659A.043. This court, employing a 4-to-1 ratio, reduced the punitive damages award to $24,000, four times the plaintiff's lost wages. The Supreme Court reversed, concluding that the jury's punitive damages award was constitutionally permissible, despite being 22 times larger than the compensatory award (once prejudgment interest was included).

In reaching that outcome, the court explained that "$6,000 in lost wages is a relatively small recovery that we would not expect to serve an admonitory, as well as a compensatory, function." *Id.* at 538. And, because there was no indication that $6,000 would have been particularly onerous for the employer, the court concluded that "the fact that the ratio between the punitive and compensatory damages is greater than a single digit does not, in itself, indicate that the punitive damages that the jury awarded were 'grossly excessive.'" *Id.* at 539. Thus, the court looked to the other guideposts as better indicators of the outer limits of due process.

The court, quoting *Campbell*, described the first guidepost—the reprehensibility of the defendant's conduct— as " '[t]he most important indicium of the reasonableness of a punitive damages award[.]' " 349 Or at 539. Viewing the evidence in the light most favorable to the plaintiff, the court explained that the employer in *Hamlin* had acted with "intentional malice, trickery, or deceit" and that the defendant's conduct

"was sufficiently reprehensible that, in the circumstances presented—where the compensatory damages are low and the ratio between the compensatory and punitive damages is not a reliable indicator of the constitutionality of the punitive damages award—defendant's conduct may justify an award of punitive damages in excess of a single-digit multiplier of the compensatory damages awarded."

*Id.* at 541.

The remaining guidepost—the difference between the punitive damages awarded and the civil penalties authorized or imposed—did not play a significant role in the court's analysis, because neither party challenged this court's conclusion that comparable civil penalties "neither militate[d] against, nor support[ed], a punitive damages award in excess of a single-digit multiplier of the compensatory damages awarded." *Id.*

After reviewing the guideposts and determining that "the punitive damages award in this case may exceed a single-digit multiplier of the compensatory damages award without violating due process," *id.*, the court addressed the ultimate question: "whether the amount of punitive

damages actually awarded—$175,000—is, nevertheless, 'grossly excessive.'" *Id.* at 542. The court answered that question in the negative after measuring the award against "awards that legislatures and courts have permitted in similar circumstances." *Id.* Accordingly, the court held:

> "[T]he compensatory damages are small and the ratio between the punitive and compensatory damages—22:1—is in the low double digits. That ratio is higher than would be constitutionally permissible if the compensatory damages were more substantial, but is not so high that it makes the award 'grossly excessive.' The amount of the punitive damages award—$175,000—also is not so high that we can say that it exceeds, rather than serves, this state's interests in deterring and punishing the violation of ORS 659A.043. We hold that the Court of Appeals erred in reversing the jury's punitive damages verdict, and we reinstate it."

*Id.* at 543-44 (footnote omitted).

In the wake of *Hamlin*, we reconsidered an earlier decision, *Lithia Motors, Inc. v. Yovan*, 226 Or App 572, 204 P3d 120 (2009) (*Lithia Motors I*), *vac'd and rem'd*, 349 Or 663, 249 P3d 1281 (2011), in which we had reduced a punitive damages award from $100,000 to $2,000, an amount four times the jury's $500 compensatory award. On remand, we applied the reasoning in *Hamlin* and concluded that the jury's full punitive damages award of $100,000 should be reinstated. *Lithia Medford LM, Inc. v. Yovan*, 254 Or App 307, 295 P3d 642 (2012) (*Lithia Motors II*).

*Lithia Motors II* involved a consumer, Yovan, who purchased a vehicle from Lithia Motors, an auto dealer. Yovan prevailed on a claim against the dealership for "threatening arrest or criminal prosecution of [Yovan]" and by "attempting to or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy did not exist," thereby violating Oregon's Unlawful Trade Practices Act. The jury awarded no economic damages, $500 in noneconomic damages, and $100,000 in punitive damages. The trial court then granted the dealership's motion for remittitur, reducing the punitive damages award to $2,000.

On appeal, we initially affirmed the trial court's ruling by an equally divided court. The Supreme Court, however, vacated that decision and remanded for reconsideration in

light of its intervening decision in *Hamlin*. On remand, we concluded that the second guidepost was indeed of limited assistance in the case, and that the other two guideposts demonstrated that "the ratio between punitive damages and compensatory damages in this case can constitutionally exceed 9-to-1." *Lithia Motors II*, 254 Or App at 327.

In reaching that conclusion, we first explained that the record established that the dealership's conduct was more than "minimally reprehensible." 254 Or App at 326. We relied on the fact that "the Oregon legislature has recognized the harm that creditors may inflict on consumers and debtors, such as [Yovan], and has indicated its intent to deter and to punish creditors who engage in that type of conduct," *id.* at 324; the fact that the dealership "knew that [Yovan] was financially vulnerable," *id.* at 325; and the fact that the dealership "engaged in trickery or deceit to further its own financial interests," *id.* at 325. In light of those facts, we concluded, "the most important guidepost, the reprehensibility of [the dealership's] conduct, supports the jury's award of punitive damages in excess of a single-digit multiplier of the $500 compensatory damages award in this case." *Id.* at 326.

Then, turning to the third guidepost (civil penalties in comparable cases), we explained that the UTPA itself provided a civil remedy rather than monetary penalties for the dealership's conduct, so the UTPA "itself is not significant in the analysis." *Id.* at 327. Nonetheless, we concluded that "[t]he civil penalty for comparable UTPA violations *** is relevant." *Id.* Specifically, we reasoned that, in a suit brought by a prosecuting attorney on behalf of the state, "a penalty of up to $25,000 can be assessed for *each* willful use of a method, practice, or act in violation of the UTPA," and that the dealership had "engaged in multiple acts of deception and abuse." *Id.* (emphasis in *Lithia Motors II*). Thus, we concluded, "The civil penalty available for UTPA violations further suggests that the punitive damages award in this case could exceed a single-digit multiplier of compensatory damages to serve the state's interest in deterring and punishing violations of the Act." *Id.* at 327.

After concluding that we were "not bound to impose a single-digit ratio," we turned to the final step of the analysis

directed by *Hamlin*: "'whether the amount of punitive damages actually awarded \*\*\* is, nevertheless, "grossly excessive."'" 254 Or App at 327 (quoting *Hamlin*, 349 Or at 542). We began that analysis, as the court did in *Hamlin*, by canvassing punitive damages awards in comparable cases from Oregon and other states:

> "The Oregon Supreme Court has repeatedly approved punitive damages awards in amounts equal to or greater than $100,000, the amount in question here. *See, e.g.,* [*Hamlin,* 349 Or] at 542, 543 ($175,000 for violation of unlawful employment practice); *Parrott,* 331 Or at 565 ($1 million for violation of the UTPA). Courts in other jurisdictions have done so as well in consumer protection cases. *See, e.g., Grabinski v. Blue Springs Ford Sales, Inc.,* 203 F3d 1024, 1026-27 (8th Cir), *cert den,* 531 US 825 (2000) (affirming punitive damages award of $100,000 and $50,000 against dealership; actual damages award of $5,300 and $2,535, for concealment of prior automobile wreck damages by dealerships in violation of the Missouri Merchandising Practices Act); *Electro Services, Inc. v. Exide Corp.,* 847 F2d 1524, 1525 (11th Cir 1998) (affirming punitive damages award of $3.5 million; compensatory damages award of $750,000, for an action against automotive battery manufacturer for deceptive trade practices); *Saunders v. Equifax Information Services, L.L.C.,* 469 F Supp 2d 343, 346, 356-57 (ED Va 2007) (in consumer action against bank and credit reporting agencies after bank improperly demanded full payment of car loan, repossessed car, and reported default to agencies, affirming $80,000 punitive and $1,000 compensatory damage award); *United Technologies Corp. v. American Home Assur. Co.,* 118 F Supp 2d 174, 175, 181 (D Conn 2000) (affirming punitive damages award of $16 million for violations under the Connecticut Unfair Trade Practices Act); *Griffith v. Barnes,* 560 F Supp 2d 29, 37-38 (DDC 2008) (awarding punitive damages of $100,000 under the D.C. Consumer Protection Procedures Act where the defendant made misrepresentations to the plaintiff, but the plaintiff did not seek actual damages); *Thorsen v. Durkin Development, LLC,* 129 Conn App 68, 76-78, 20 A3d 707, 713-14 (2011) (affirming punitive damages award of $280,000; compensatory damages award of $30,211.43 for violations of the Connecticut Unfair Trade Practices Act)."

*Lithia Motors II*, 254 Or App at 327-28. Based on that survey, we concluded that "a $100,000 punitive damages award is

not outrageous or 'grossly excessive' as measured by similar types of cases." *Id.* We further concluded that the dealership was "fully on notice" that the jury could assess punitive damages of that magnitude and that the $100,000 award was not "grossly excessive given the deterrent function that it serves and the resources [the dealership] has to pay it." *Id.* at 329. Accordingly, we reversed the trial court's judgment remitting punitive damages and instead reinstated the jury's full award.

We conclude that this appeal, like *Hamlin* and *Lithia Motors II*, is a case in which the jury's compensatory award was too small to serve any admonitory function, and that the second guidepost is therefore a poor indicator of the constitutional limits on a punitive damages award.[3] And, in light of the first and third guideposts, we further conclude that the trial court erred in applying a strict 4-to-1 ratio to the punitive damages award.[4]

The "most important indicium of reasonableness of a punitive damages award"—the reprehensibility of the defendant's conduct—is consistent with a punitive damages award in this case that well exceeds a single-digit multiplier of nominal damages. Emmert, although risking purely economic harm to Evergreen, engaged in "intentional malice, trickery, or deceit" on par with that in *Hamlin* and *Lithia Motors II*—conduct "sufficiently reprehensible" to merit a punitive damages award that will serve a correspondingly

---

[3] Evergreen's argument starts from the premise that the "actual harm" in this case was far greater than the nominal damages award—again arguing that, "[i]n light of the evidence that the property was worth $1,390,000, and the debt was only $613,979.59, resulting in an equity of more than $700,000 having been taken by [Emmert], there is no constitutional barrier to such an award." We cannot simply disregard the jury's award of nominal damages when assessing what was taken by Emmert. The jury, rightly or wrongly, concluded that he profited only nominally from the breach of fiduciary duty, and there is scant evidence that Evergreen itself, already experiencing significant financial distress, was significantly harmed by losing the property to foreclosure; that was, after all, where the property was headed anyway, and Evergreen's options appear to have been limited to a bankruptcy filing.

[4] *See also Hamlin*, 349 Or at 547 (Gillette, J. pro tempore, dissenting) ("No matter what the tort is, if a jury awards only $1 in nominal compensatory damages, a single-digit ratio of punitive damages—$9—is far too low. In such cases, the award must be greater than the single-digit ratio * * *.").

sufficient admonitory function, certainly something larger than the typically permissible ratios.

With regard to the third guidepost, we are not aware of any civil penalties that provide an exact fit for the type of breach of fiduciary duty at issue here. There are two statutory schemes, however, that suggest significant fines for deceitful business practices involving real estate or procuring debt instruments. Oregon's Unlawful Trade Practices Act, which we relied upon in *Lithia Motors II*, makes it unlawful for a person, in the course of the person's business, to "employ[ ] any unconscionable tactic in connection with the sale, rental or other disposition of real estate, goods or services or collection or enforcement of an obligation," ORS 646.607, and, more generally, to "engage[ ] in any other unfair or deceptive conduct in trade or commerce," ORS 646.608(1) (u). In an enforcement action by a prosecuting attorney, the civil penalties for that type of conduct include a fine as high as "$25,000 per violation." ORS 646.642(1).

Oregon's securities laws, albeit not directly in play here, provide a similarly substantial penalty for deceit in the procurement of a debt instrument. ORS 59.135 makes it "unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security" to "employ any device, scheme or artifice to defraud" or "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person[.]" "Securities," in turn, include "a note, * * * debenture, evidence of indebtedness, * * * real estate paper sold by a broker-dealer, mortgage banker, mortgage broker * * *." ORS 59.015(19)(a). The civil penalties for violating Oregon's securities laws— including fraudulently obtaining a security instrument— include fines of "not more than $20,000 for each violation and a maximum penalty of $100,000 for a continuing violation." ORS 59.255(2).

Those statutory schemes, in our view, further suggest that the business practices engaged in by Emmert— breaching his fiduciary duties and secretly obtaining the promissory note and deed of trust, which allowed him to

foreclose on the property and obtain it for himself—justify something exceeding a single-digit ratio in this case.

Having decided, as the court did in *Hamlin*, "that the punitive damages award in this case may exceed a single-digit multiplier of the compensatory damages award without violating due process," 349 Or at 541, we must now consider "whether the amount of punitive damages actually awarded—[$600,000]—is, nevertheless, 'grossly excessive.'" *Id.* at 542. For the reasons that follow, we conclude that the award, although high, is not grossly excessive, particularly in light of punitive damages awards that courts have approved in other cases involving breaches of fiduciary duty, and in light of the financial deterrent required to prevent the type of calculated breach of duty involved in this case.

In cases in which parties have suffered significant financial harm from the acts of disloyal agents, juries often have awarded—and courts have approved—large punitive damages awards. *E.g.*, *Whitney v. Citibank, N.A.*, 782 F2d 1106 (2d Cir 1986) (approving award of $1.5 million in punitive damages and $236,677.25 compensatory damages for bank's knowing participation in breach of fiduciary duties to plaintiff); *Armstrong v. Republic Realty Mortg. Corp.*, 631 F2d 1344 (8th Cir 1980) (upholding punitive damages award of $125,000 and $14,000 in compensatory damages for breach of fiduciary duty by mortgage broker); *McDermott v. Party City Corp.*, 11 F Supp 2d 612 (ED Pa 1998) (jury's award of $375,000 in punitive damages was not constitutionally excessive based on $42,537.61 in compensatory damages for agent's breach of duty by usurping of corporate opportunity); *E.J. McKernan Co. v. Gregory*, 252 Ill App 3d 514, 623 NE2d 981 (1993) (affirming jury's award of compensatory damages totaling $1,067,000 and punitive damages of $420,000 for agents' exploitation of fiduciary relationship by usurping corporate opportunities); *National Bank v. Doss*, 141 Ill App 3d 1065, 491 NE2d 106 (1986) (approving punitive damages of $2,000,000 and compensatory damages of $500,000 against a lawyer who purchased farm for a nominal sum from client of "limited mental capability"). But courts have also upheld large awards when the actual damages suffered

were relatively small. *E.g.*, *Schaffer v. Edward D. Jones & Co.*, 1996 SD 94, 552 NW2d 801 (1996) (affirming jury's punitive damages award of $750,000 against brokerage that deceived its investors, despite fact that jury awarded only $25,000 in compensatory damages).

Comparable cases involving breaches of fiduciary duty tell us that the jury's award of $600,000 in punitive damages in this case is a serious sanction, but they do not persuade us that it is unconstitutionally excessive. One of the guiding principles in those breach of fiduciary duty cases, as in all punitive damages cases, is that the award serve, rather than exceed, the state's interest in deterring the conduct at issue. *See Hamlin*, 349 Or at 543. In this case, there was evidence that Emmert had a net worth of approximately $160,000,000; that he saw potentially large profits in breaching his fiduciary duties to Evergreen and obtaining the company's real property for himself; and that he made a calculated decision to breach his duties to the company in pursuit of that perceived individual profit. The jury, hearing that evidence, as well as evidence of Emmert's previous behavior in other business dealings, concluded that an award of $600,000 was necessary, given his net worth and history, to deter him from engaging in a similar calculation in the future. We cannot, on this record, say that the jury's decision in that regard went beyond the state's interests in preventing future tortious conduct by Emmert. We therefore reverse and remand for further proceedings consistent with that conclusion.

Reversed and remanded on appeal and on cross-appeal.

**Wollheim, J.,** concurring in part, dissenting in part.

I concur with the majority opinion with one exception. For the reasons expressed in my dissent in *Lithia Medford LM, Inc. v. Yovan*, 254 Or App 307, 330, 295 P3d 642 (2012) (Wollheim, J. concurring in part, dissenting in part), I respectfully dissent from the award of punitive damages in the sum of $600,000.

I respectfully dissent.